GREAT LAKES AIRCRAFT CO., INC.

v.

CITY OF CLAREMONT

March 9, 1992

272

*Upton, Sanders & Smith*, of Concord (*Ernest T. Smith, III*, and *Gilbert Upton* on the brief, and *Mr. Smith* orally), for the plaintiff.

*Wadleigh, Starr, Peters, Dunn & Chiesa*, of Manchester, and *Clauson, Smith & Whelan*, of Hanover (*Eugene M. Van Loan, III* and *K. William Clauson* on the brief, and *Mr. Van Loan* orally), for the defendant.

BROCK, C.J. The defendant, the City of Claremont (City), appeals from a jury verdict in the Superior Court (*Barry*, J.) awarding the plaintiff, Great Lakes Aircraft Company (GLAC), damages of $5,250,000 for breach of a ground lease. The City appeals on numerous grounds relating to issues both of liability and of damages. We affirm the verdict as to liability and reverse, in part, the damages award.

In 1979, the City and the Federal Aviation Authority (FAA) agreed to develop a master plan and Airport Layout Plan (ALP) for the

development of the Claremont airport. In 1984, the City entered into an airport lighting agreement with the FAA. Under the agreements, the City became eligible for federal financial aid and, in return, was obligated to develop the airport in accordance with the ALP.

Early in 1984, GLAC purchased the rights to build the Great Lakes aircraft, an open cockpit biplane, and established its manufacturing operation at Hampshire Manufacturing, a commercial space located in Claremont. The following year, after GLAC became a tenant at will, it began a search for a different and more suitable manufacturing location elsewhere. Encouraged by letters sent previously to GLAC by the City indicating its willingness to lease land at the Claremont airport, GLAC turned to the City for help in finding new manufacturing space.

At about this same time, GLAC became interested in acquiring Champion Aircraft, a Texas company with a line of three different aircraft which, at that time, were not in production. GLAC's intention to produce both Great Lakes and Champion aircraft added significant space requirements to its immediate need for a manufacturing facility.

GLAC considered a number of locations. Together with Kenneth Lurvey, the City's acting community development director, GLAC negotiated to acquire the Garrison Stove property located near the airport. On July 8, 1985, while negotiations were pending, Lurvey wrote to Bruce Moore, a GLAC director, stating that if the Garrison Stove property could not be acquired, "the City [had] vacant land at the Airport that could be leased for [GLAC's] purpose." The letter went on to specify the available lot and to describe the general terms of the lease.

John Labelle, president of GLAC, told Lurvey that the land referred to in the July 8 letter lacked sufficient access and was therefore unacceptable. Soon after, however, the Garrison Stove property was withdrawn from the market, and Labelle met with Lurvey at the airport to review other potential building sites. After viewing several unacceptable locations, Lurvey told Labelle: "You can have the space across from the Satzow's Meat Market." Lurvey did not mention that the ALP reserved this land for "future airport growth" and "T-hangars."

GLAC considered the location suitable and hired Peter Daniels, a contractor with previous experience developing commercial projects at the airport, to construct the new facility. Daniels engaged Wayne McCutcheon as a surveyor, and, after receiving a copy of the ALP from the City, Daniels and McCutcheon put together a site plan. The

plan was reviewed by Lurvey, endorsed by the airport commission, approved by the planning board, and finally presented to the city council, which authorized the city manager, Joanne Wrench, to enter into a ground lease with GLAC.

The lease, executed on November 26, 1985, required GLAC to begin construction within thirty days and to complete construction within nine months after the execution date. GLAC broke ground in mid-December. In early February 1986, however, the FAA inspected the airport and sent a letter to the City objecting to the GLAC construction because: (1) Form 7460 (notice of intent to construct) had not been filed; (2) the location of the building appeared to violate the Airport Master Plan which required a 300-foot set-back, although the ALP indicated a 250-foot set-back and the building was setback 255 feet; (3) the building displaced T-hangars proposed on the ALP; and (4) the GLAC facility might not constitute "airport use" and, therefore, should not be located in an airport use area. The FAA stated that "any on airport construction which is in violation of [the] ALP would place the City in non-compliance and could jeopardize future federal funding."

The City responded by issuing a stop-work order to GLAC on February 13. Assured by the City that the problem would be taken care of, GLAC promptly ceased construction without contest. The City filed Form 7460 with the FAA and, by March 6, authorized its engineering firm, Dufresne-Henry, to update the ALP to reflect the GLAC project as required by the FAA. The City imposed a $3,000 spending cap on the ALP updating project. On April 11, 1986, after submitting the appropriate forms to the FAA, the City authorized GLAC to resume construction. Without a formal waiver from the FAA, however, GLAC was unable to go forward with its financing plan; although the FAA gave assurances that a formal waiver would be forthcoming, it first required the completion of the revised ALP.

At this point, the City, believing that GLAC had sufficient assurances to proceed with construction, delayed finalizing the ALP by refusing Dufresne-Henry's request for authority to exceed the original $3,000 spending cap on the City's contract. This dispute between the City and Dufresne-Henry lasted from April 23, 1986, until July 10, 1986, all the while leaving GLAC without serious financing options. The revised ALP, submitted on August 13, 1986, gained FAA approval by September 11, 1986. The waiver by this time was too late; several of GLAC's creditors had filed actions and attached assets, rendering GLAC insolvent and unable to proceed with construction.

In August 1986, GLAC initiated this action claiming negligence and breach of contract against the City, former City Manager Joanne Wrench, and Wayne McCutcheon. After the City moved to dismiss the negligence claims on the grounds of governmental immunity pursuant to a provision of the Aeronautics Act, RSA 422:17, claims against the other defendants were dropped, and GLAC filed an amended writ in February 1989, containing five counts in assumpsit against the City.

In April 1989, shortly before trial, the City filed two motions *in limine*. The first moved to exclude evidence of pre-lease misrepresentations, and the second moved to exclude the use of evidence relating to the purchase of Champion Aircraft for the purpose of determining damages. The court denied both motions, and the case proceeded to a lengthy trial, resulting in a general verdict awarding GLAC $5,250,000 in damages. The court denied the City's post-trial motions, and this appeal followed.

## I. *Governmental Immunity*

First, the City argues that the trial court erred in denying its motions for summary judgment and for directed verdict on the ground that GLAC's claims for breach of contract are barred by governmental immunity. RSA 422:17 provides:

> "The construction, maintenance and operation of air navigation facilities is hereby declared a public governmental function and no action or suit shall be brought or maintained against the state or any county or municipality thereof, or its officers, agents, servants or employees in or about the construction, maintenance, operation, superintendence or management of any air navigation facility."

This issue turns on the scope of the language "no action or suit." The City asserts that "no action or suit" encompasses contract actions and, therefore, that the trial court erred in not dismissing GLAC's claims in assumpsit. GLAC, on the other hand, maintains that the phrase "no action or suit" prohibits only tort actions.

██ ██ As a first step in statutory construction, we examine the language found in the statute itself, *Town of Wolfeboro v. Smith*, 131 N.H. 449, 452, 556 A.2d 755, 756 (1989); *Appeal of Coastal Materials Corp.*, 130 N.H. 98, 101, 534 A.2d 398, 399 (1987), and where possible, we "ascribe the plain and ordinary meanings to words used," *Leach v. O'Neil*, 132 N.H. 665, 668, 568 A.2d 1189, 1191 (1990). However, "[t]o divine the intent of a statute, we will determine its meaning

from its construction as a whole, not by examining isolated words and phrases." *Petition of Jane Doe*, 132 N.H. 270, 276, 564 A.2d 433, 438 (1989). With these rules of construction to guide us, we hold that the governmental immunity granted by RSA 422:17 does not preclude GLAC's contract action. Rather, reading "no action or suit" in context with the preceding clause, which declares the construction of an airport to be "a public governmental function," we conclude that the statutory intent is to confer immunity only from tort liability.

We note first that RSA 422:17 was enacted in 1941, well before our decision in *Merrill v. Manchester*, 114 N.H. 722, 332 A.2d 378 (1974), which abrogated, with limited exceptions, municipal tort immunity, reasoning that it "offends the basic principles of equality of burdens and of elementary justice." *Id.* at 724, 332 A.2d at 380. Prior to *Merrill*, the question of governmental immunity turned on whether the municipality acted in a proprietary capacity or, rather, exercised a governmental function:

> "Insofar as the municipalities exercise a governmental function they are held immune from liability for their torts. When acting in their corporate or proprietary capacity they are liable for their torts under the same principles applied to private corporations."

*Id.* at 725, 322 A.2d at 381.

■ The justices of this court, in an advisory opinion, previously considered, indirectly, the import of the governmental-proprietary distinction. *Opinion of the Justices*, 101 N.H. 546, 549, 134 A.2d 279, 281 (1957). It was stated there that a pending bill was constitutional as it related to the grant of sovereign immunity from tort liability, in part because RSA 422:17 had declared the establishment of municipal airports to be a "public governmental function." Thus, viewing the statute as a whole and within its historical context, the declaration, that the "construction, maintenance and operation" of an airport is a "governmental function," supports the conclusion that the intended immunity was the historic immunity from tort claims in cases where there was the exercise of a governmental function.

■ The expansive view of governmental immunity under RSA 422:17 urged upon us by the City is also contrary both to the weight of authority and to the statutory scheme of the Aeronautics Act, RSA chapter 422. As a general rule,

> "a municipal corporation is bound by, and may sue and be sued on, all contracts which it may legally enter into in the

same manner as a private corporation or an individual. The immunity of government from liability on contracts has never been regarded as applicable to local governmental units."

17 E. McQUILLIN, MUNICIPAL CORPORATIONS § 49.60, at 286 (3d ed. 1982); P. LOUGHLIN, 14 NEW HAMPSHIRE PRACTICE, LOCAL GOVERNMENT LAW § 992, at 42 (1970). Consistent with this maxim, many jurisdictions have interpreted similar statutes declaring the operation of municipal airports to be a "governmental function," without more, as a declaration of municipal immunity only from torts. *Kirksey v. Fort Smith*, 227 Ark. 630, 300 S.W.2d 257 (1957); *Imperial Production Corp. v. Sweetwater*, 210 F.2d 917 (5th Cir. 1954); *Van-Gilder v. Morgantown*, 136 W. Va. 831, 68 S.E.2d 746 (1949). Other jurisdictions have applied even narrower interpretations, choosing to limit the applicability of such a pronouncement to issues other than immunity. *Granite Oil Secur. v. Douglas County*, 67 Nev. 388, 402, 219 P.2d 191, 198 (1950) (adopting view that declaration of governmental function is simply in justification of powers granted); *Rhodes v. Asheville*, 230 N.C. 134, 140, 52 S.E.2d 371, 375 (1949) (declaration of governmental function merely authorizes the undertaking of a proprietary function by the legislative determination that it serves a public purpose); *accord Caroway v. Atlanta*, 85 Ga. App. 792, 70 S.E.2d 126 (1952); *Brasier v. Cribbett*, 166 Neb. 145, 88 N.W.2d 235 (1958). The fact that RSA 422:17 specifically bars "suit[s] or actions" precludes the interpretation that the statute narrowly declares a governmental function, and requires the interpretation that the statute confers tort immunity.

Our conclusion is further bolstered by the Act's declaration of purpose, which states that the Act's purpose is, in part, to provide for "the protection and promotion of the public interest and safety in connection with the operation of aircraft." RSA 422:2, IV. Conferring immunity from contract actions would not serve this purpose. Furthermore, it seems unlikely that the various private contractors and businesses required to promote, construct and maintain a municipal airport would enter into contracts with the City if they did not have a remedy for breach. *See Pan-Am Tobacco Corp. v. Department of Corrections*, 471 So. 2d 4, 5 (Fla. 1984) (where State agencies are empowered to contract for necessary goods and services, immunity from suit for breach would be inapposite because contract would fail for lack of mutuality). Thus, RSA 422:17 does not preclude GLAC's contract claims against the City.

II. *Contract Claims*

In this appeal, the City attacks each of the five counts, all of which sound in contract. The premise of its argument, which we accept only for purposes of this appeal, is that when a general verdict is returned in a case with multiple counts, reversal is required if error affects one or more of the counts submitted to the jury. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products* Co., 370 U.S. 19, 30 (1962); *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 662 (1st Cir. 1981).

As a preliminary matter, the City argues that the trial court failed to instruct the jury clearly on the need for unanimity, and given the general verdict returned by the jury, a new trial is required because we are unable to discern whether the verdict was unanimous as to any or all theories of liability. The trial court, at the end of its first charge to the jury, instructed as follows:

"Your verdict at the time you reach the verdict, must be unanimous. All 12 of you must agree on both liability and damages in the event you find against the defendant."

■ A chambers conference immediately followed where the City raised numerous objections to the charge but failed to object specifically to the instructions on unanimity. We do not "consider grounds of objections not specified or called to the court's attention at the trial." *State v. Cassell*, 129 N.H. 22, 24, 523 A.2d 40, 41 (1986). We proceed to consider the issues properly raised concerning the five counts in contract.

Count I alleges that by issuing the stop-work order in February 1986, the City breached the express covenant of quiet enjoyment embodied in paragraph 16 of the lease, which provides:

"Lessor agrees that the Lessee shall peacefully and quietly have, hold and enjoy the property without any manner of hindrance or molestation by Lessor or anyone lawfully claiming by, through or under Lessor."

The City argues that the trial court erred by failing to explicitly instruct the jury that any violation by the City of its FAA agreements did not amount to a breach of the covenant of quiet enjoyment under the lease.

■■ "The purpose of jury instructions is to identify the factual issues which are material for a resolution of the case, and to inform the jury of the appropriate standards by which they are to decide

them. . . ." *Johnston v. Lynch*, 133 N.H. 79, 89, 574 A.2d 934, 940 (1990). The trial court is not obligated to use the identical language requested by a party "[a]s long as the court adequately states the law that applies to the case. . . ." *Id.* at 90, 574 A.2d at 940.

In the initial charge to the jury, the court began with an overview of GLAC's allegations and the City's responses, followed by a general statement of the applicable law, emphasizing that GLAC had the burden to prove its allegations, and concluded by instructing the jury on the evidentiary standards concerning issues of liability and damages. After a chambers conference, the court returned to give additional instructions in order to clarify estoppel. The following day, the court delivered supplemental instructions. The court began by reading the preamble and the specific counts of GLAC's writ, followed by a statement of the City's responses, and concluded with further instruction on estoppel.

■ The City's request for various supplemental instructions was founded upon a concern that the jury may have improperly equated a breach of the FAA agreements by the City with a breach of the GLAC lease agreement. Upon reviewing the court's instructions as a whole, and in light of the record, we find no reason to share the City's concerns. The court's instruction on count I states that GLAC had the burden to prove that the City issued a stop-work order in violation of paragraph 16 of the lease. Moreover, GLAC properly argued that evidence of the City's failure to comply with the FAA agreements, which could have resulted in the loss of federal funding, served to explain why the City may have issued the stop-work order. Nothing in the instructions suggests that the jury could return a verdict for GLAC on count I if they merely found that the City breached the FAA agreements. Consequently, we find no error in the trial court's instructions concerning the import and proper application of evidence showing that the City may have breached its agreements with the FAA.

The second challenge to count I is that the trial court erred in failing to instruct the jury concerning issuance of the stop-work order pursuant to the City's police power. According to the City, it issued the stop-work order because of GLAC's failure to comply with site and zoning permits mandating compliance with "FAA requirements," including the requirements of the ALP. Because the issuance and enforcement of such permits fall within the ambit of the City's police powers, the City argues that the stop-work order did not amount to a breach of the covenant of quiet enjoyment under the

lease. Moreover, this issue, according to the City, should have been decided by the jury.

The City's proposed jury instruction number 18 reads as follows:

> "The City of Claremont acts in a dual capacity. It acts as a private landlord under the ground lease, [and] it acts as a municipality. If you find that in issuing a stop work order it acted as a municipality with regard to the airport, then as to that issue you shall enter judgment for the City. If you find that as to its dealings with the FAA it acted as a municipality then you shall render judgment for the City."

By refusing to instruct the jury on this issue, the trial court in effect ruled as a matter of law that the City did not issue the stop-work order in furtherance of its police power. *See Plaistow Bank & Trust Co. v. Webster*, 121 N.H. 751, 755, 433 A.2d 1332, 1333 (1981) (trial court impliedly rejected one party's argument by awarding judgment for the other party).

Although "the trial judge has been granted little discretion to withdraw questions of substantive fact from a jury's consideration," *Kierstead v. Betley Chevrolet-Buick, Inc.*, 118 N.H. 493, 495, 389 A.2d 429, 431 (1978), the issue before us is a mixed question of law and fact. *See Crocker Nat. Bank v. San Francisco*, 782 P.2d 278, 281 (Cal. 1989) (mixed questions of law and fact concern the application of a rule of law to the facts and the consequent determination whether the rule is satisfied). We will not overturn the court's ruling on a mixed question of law and fact unless it is clearly erroneous. *See Coll v. McCarthy*, 72 Haw. 20, 804 P.2d 881, 886 (1991) (mixed questions of law and fact are reviewed under the clearly erroneous standard); *Matter of Estate of Ames*, 152 Wis. 2d 217, 232, 448 N.W.2d 250, 255–56 (1989) (when trial court's conclusion of law is so intertwined with factual findings supporting its conclusion, the reviewing court should give it weight). If, however, the court misapplies the law to its factual findings, we review the result on appeal independently under a plain error standard. *Town of Goffstown v. Morgrage*, 122 N.H. 591, 596, 448 A.2d 385, 388 (1982) ("The findings and rulings of the trial court must be sustained unless they are lacking in evidential support or tainted by error of law"); *Lee Development Co. v. Papp*, 166 Ariz. 471, 476, 803 P.2d 464, 469 (1990) (reviewing court not bound by trial court's findings combining both fact and law when there is an error as to the application of law).

The City argues that the trial court misapplied the law, citing 5B R. POWELL, THOMPSON ON REAL PROPERTY, § 1130, at 456 (P. Rohan ed., 1991) for the proposition that "[i]f the tenant's enjoyment is interfered with in the exercise of the police power and not by breach of any obligation on the part of the landlord, the tenant's covenant of quiet enjoyment is not breached." But, the facts in the single case applying the proposition cited by the City, *Lowe v. Root*, 531 P.2d 674 (Mont. 1975), are readily distinguished from the facts in this case. In *Root*, the lessor/city attorney, in an effort to oust the lessee, notified the county attorney that the leased premises were not in compliance with the municipal housing codes. *Id.* at 680. The court found no breach of quiet enjoyment because, in part, the lessor lacked privity with the party dispossessing the lessee.

In the case before us, however, the lessor and municipality are one and the same. The City argues that it wears two hats, acting first as a lessor by contracting with GLAC, and then as a municipality by enforcing municipal permits. However, the City's choice to issue the stop-work order did not result from its exercise of its police power, but from its decision to give priority to the FAA agreements. The City's effort to change hats now and invoke its police power is pretextual. Indeed, the official responsible for the order, City Manager Joanne Wrench, readily admitted that the order was issued as a result of the City's violation of its agreement with the FAA, and not for a city permit violation by GLAC. When asked about issuing the order, she testified:

> "I was very concerned about the ramifications of [issuing the order] . . . I believed we were in violation of our agreement under the Master Plan with the FAA. I also was concerned about—I felt that we would be in violation of the lease agreement that we had with Great Lakes. . . . I had to place the [priority] of honoring the agreement in the first case with the [FAA] to keep our plan current and the airport funding."

Although the city manager's subjective intent is not necessarily dispositive of the issue, such evidence strongly supports GLAC's argument that the City did not act pursuant to its police power. Thus, upon reviewing the record here, we find that the trial court's ruling that the City did not act under its police power is supported by substantial evidence and reflects a proper application of the law.

We next address counts II–V. According to the City, these counts should not have been submitted to the jury either because they al-

lege that the City breached implied covenants, where the lease contains corresponding express covenants, or do not state recognized causes of action.

## A. Implied Covenants

 First, as to the implied covenants, the City cites *Crouch v. Fowle,* 9 N.H. 219 (1838), to support the general assertion that implied covenants can not stand where the lease contains express covenants on the same matter. Yet, *Crouch v. Fowle* plainly states that in "general, implied covenants are qualified and restrained by any express covenants of a more limited character." *Id.* at 222. This rule does not eliminate implied covenants from agreements with express terms; rather, it serves only to check "anything inconsistent with those express covenants, or which might otherwise have implied an undertaking of a more enlarged character." *Id.* at 223; *see also* 49 AM. JUR. 2d *Landlord and Tenant* § 331 (1970); Annotation, *Breach of Covenant for Quiet Enjoyment in Lease,* 41 A.L.R.2d 1414, 1423 (1955) ("implied covenant of quiet enjoyment may . . . be as extensive as that of an express covenant, yet it does not go further. . . .")

 Consistent with this rule, the trial court instructed the jury as follows:

> "While every lease includes [an] implied covenant, such a general implied covenant is qualified and restrained by the expressed covenants of the lease. Actions in accordance with the express covenant cannot breach any implied covenants."

The City has neither alleged that the implied covenant of quiet enjoyment exceeds the scope of the express covenant nor offered any evidence to suggest that the jury failed to follow the instructions. *State v. Novosel,* 120 N.H. 176, 186, 412 A.2d 739, 746 (1980) ("Our system of justice is premised upon the belief that jurors will follow the court's instructions."). Thus, counts II–V were not subject to dismissal simply because they were founded on implied obligations.

## B. Cognizable Actions

Counts III and IV face additional and more substantial challenges. We begin with count III, which, as presented to us on appeal, appears to be mercurial and poorly defined. The City initially argues that count III of GLAC's complaint asserts a breach of an implied-in-fact covenant of fitness for a particular purpose, and that either such a covenant is not recognized in this jurisdiction or, if there is a viable cause of action on such a covenant, the court and not the jury

should have decided the issue. GLAC urges a liberal, if not an imaginative, application of the pleading rules, claiming that count III, incorporating the writ's preamble, alleges a cause of action in promissory estoppel.

According to GLAC, promissory estoppel prevents the City from raising contract terms as a defense to GLAC's various claims. In reply, the City maintains that GLAC failed to plead promissory estoppel, and argues that promissory estoppel neither applies in the face of an express agreement, nor serves as an affirmative ground for recovering consequential damages. The issues are whether count III pled promissory estoppel or breach of an implied covenant, and if the latter, what covenant.

First, we reject the City's argument that count III alleges a breach of a covenant of fitness for a particular purpose. We find that count III of GLAC's amended writ alleges that the City breached an implied covenant of quiet enjoyment by issuing a stop-work order after wrongly instructing GLAC where to locate the facility. While the City's attempt to characterize GLAC's alleged covenant as a covenant of fitness for a particular purpose is more plausible than GLAC's surprising effort to conjure the elements of promissory estoppel, neither view constrains us in reaching our decision. We review GLAC's pleadings independently and find that count III, as pled, adequately supports the claim. *See Gleason v. Elbthal Realty Trust*, 122 N.H. 411, 415, 445 A.2d 1104, 1106 (1982) ("If the pleadings contain allegations which permit counsel to understand the dispute and the court to decide the controversy on its merits, the pleadings meet the test of adequacy.").

 Count III essentially mirrors count II by alleging that the City breached the implied covenant of quiet enjoyment by issuing the stop-work order. *See Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 137, 562 A.2d 187, 189 (1989) (legitimate merger of pleadings where trial court treated covenant of good faith in count II as the term breached under count I). We find no prejudice in the duplicative count because the court clearly instructed the jury that GLAC was not entitled to recover twice for the same loss.

We next consider whether the trial court adequately instructed the jury on count III. Here, the City argues that the court improperly instructed the jury that count III alleged a breach of a covenant of fitness for a particular purpose. The court initially instructed on count III, in part, as follows:

"Implied in every lease is a covenant of quiet enjoyment which is an assurance by the landlord that the tenant will be

entitled to enjoy the premises and the possession of the premises for the purpose of [*sic*] which they were intended."

In answer to a question submitted by the jury after less than a day of deliberations, the court gave further instructions on count III, stating:

"Count III, the plaintiff alleging that in leasing the premises to the plaintiff, *the defendant granted to the plaintiff an implied covenant of quiet enjoyment*; that the defendant had *represented* to the plaintiff that it had land available at the Claremont Airport for lease; that the defendant, before entering into the agreement with the FAA at a time prior to November 26, 1985, had entered into an agreement with the FAA . . . concerning the future development of said airport; . . . that the issuance of the stop work order, together with the violation of the FAA regulations, *rendered the premises unusuable* [*sic*] *for the purpose of* [*sic*] *intended by the parties* as set forth in their lease . . . ."

(Emphasis added.) Although fragments of the language support the City's interpretation, we read the instructions as a whole and find that the court adequately instructed the jury that count III alleged a breach of an implied covenant of quiet enjoyment.

In light of the fact that a general verdict was returned, we must review each alternative theory which the jury might have applied in returning a plaintiff's verdict on count III. A review of the record and the parties' arguments on appeal leads us to conclude that the jury could have reached a plaintiff's verdict on count III in one of two ways. First, the jury might have rejected the City's argument that certain contract terms, characterized as the "defense" clauses by the court, placed the risk of FAA compliance upon GLAC, and returned its verdict based on the breach of the implied covenant of quiet enjoyment. Second, the jury might have viewed the contract terms as legitimate "defenses," but refused to apply them under an equitable estoppel theory. We find that the jury properly could have returned a verdict for GLAC based on either theory as both theories of liability are supported by sufficient evidence and are properly grounded in the law.

We first note that the court did not determine, as a matter of law, the meaning of the contract, choosing instead to instruct the jury to find the meaning of the contractual terms raised by the City as defenses. "While the interpretation of a contract is generally a

question of law for the court, when there is a disputed question of fact as to the terms of a contract, it is to be resolved by the trier of fact." *Peabody v. Wentzell*, 123 N.H. 416, 418, 462 A.2d 105, 107 (1983) (citation omitted). Moreover, the factual finding "will not be disturbed unless it is erroneous as a matter of law or unsupported by the evidence." *Johnson v. Nash*, 131 N.H. 731, 734, 559 A.2d 842, 843 (1989); *Town of Goffstown v. Morgrage*, 122 N.H. 591, 596, 448 A.2d 385, 388 (1982).

██ ██ The first possibility, a finding by the jury that the lease provisions do not place the burden of risk concerning FAA compliance on GLAC, is supported by substantial evidence. As a preliminary matter, we hold that the trial court did not err in instructing the jury that the City had the burden to prove the meaning of the contract terms raised as defenses to GLAC's claims. "If a party seeks to make out that certain words in a contract were intended to have a meaning different from their ordinary sense, he must prove such facts." 29 AM. JUR. 2d *Evidence* § 141, at 176 (1967).

Paragraph five of the lease agreement provides:

> *"Condition of Property.* The Lessee shall accept the property in its present as is condition for which the Lessor does not represent any warranties."

The City maintains that paragraph five disclaims all warranties, and includes a disclaimer that its agreements with the FAA may engender conflicts affecting GLAC's use of the land, and that the advent of any such conflict is a risk assumed by GLAC. GLAC argues that the "as is" provision refers only to the physical condition of the land, such as the risk of poor soil conditions which may adversely effect GLAC's construction plans.

We interpret a lease "to reflect the parties' intentions at the time of contracting." *Woodstock Soapstone Co. v. Carleton*, 133 N.H. 809, 815, 585 A.2d 312, 315 (1991). Here, the record supports a conclusion that the parties agreed at the time of contracting that paragraph five was limited to the physical condition of the property. Lurvey, who was actively involved in the lease negotiations on behalf of the City and assisted in drafting the agreement, testified at trial that the "as is" clause referred to physical limitations or defects in the property, and that GLAC assumed the risk in that respect. The evidence also supports a finding that GLAC's understanding of the scope of the term is in accord with Lurvey's stated intent. Thus, a finding by the jury that paragraph five was limited to the physical condition of the property is supported by the record.

The City's efforts on appeal to foster a reasonable disagreement concerning the meaning of paragraph five, even if successful, would, nevertheless, be unavailing. The law is well settled that "[t]he language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." *Id.* The trial court properly instructed the jury that, in order to resolve ambiguity concerning intent, the jury must consider "the situation of the parties at the time of their agreement and the object that was intended thereby, together with all the provisions of their agreement taken as a whole." *R. Zoppo Co. v. City of Dover*, 124 N.H. 666, 621, 475 A.2d 12, 15 (1984). We find that the City's interpretation of the "as is" clause which assigns to GLAC the risk that the City would issue a stop-work order as a consequence of the FAA's efforts to enforce the grant and ALP agreements could have been properly rejected by the jury.

When read in the context of the lease as a whole, GLAC's interpretation of paragraph five is well supported. Paragraph 1.1 required GLAC to begin construction within thirty days. Given the magnitude of GLAC's construction project, such a brief period between the execution of the lease and commencement of construction strongly supports a conclusion that GLAC did not assume the risk that existing agreements between the City and third parties would conflict with GLAC's rights under the lease. The jury could have reasonably concluded that if GLAC had assumed the greater risk of potential conflicting agreements concerning the property, paragraph 1.1 would have reflected a concomitant increase in the time period necessary for GLAC to find such agreements and to assess adequately the resulting risk. Given the City's presumed awareness of its agreements with third parties, a reasonable interpretation of paragraph five in light of paragraph 1.1 would place upon the City the risk that such agreements might affect its ability to perform under the lease.

The long term objectives embodied in the agreement undermine the City's claim that paragraph five pertains to more than the physical condition of the property. This is not a contract contemplating performance (and consequently risks) which would be brief, exposing the parties to only minimal loss in the event of breach. Rather, the lease provided GLAC with a tenancy of ninety-nine years. Although the rent payments were nominal, the overall investments by GLAC and the City's expectant gain in tax basis and jobs were substantial. Consequently, we conclude that the evidence supports a finding that at the time of contracting, the parties did not intend to

allocate to GLAC the risk of potential contractual conflicts between the lease and the FAA agreements entered into by the City.

██ We next consider paragraph twelve, which states:

> "*Permitted Contests*. Lessee, at its expense, and, if legally required, in the name of the Lessor, may contest by appropriate legal proceedings conducted in good faith and with due diligence the amount or validity or application, in whole or in part, of any imposition or lien therefor or any legal requirement, . . . ."

According to the City, the obligation to challenge the FAA's assertions that the GLAC project violated the ALP fell upon GLAC. This argument is implausible. GLAC has never questioned the FAA's right to hold the City to the terms of the grant and ALP agreements to which GLAC was not a party. Rather, GLAC's claims arose from the stop-work order issued by the City in response to the FAA notice of non-compliance. Certainly, paragraph twelve does not apply to direct actions between GLAC and the City; nor does GLAC's failure to challenge the FAA's assertions, regardless of the vicarious impact on GLAC under these circumstances, foreclose a direct action between GLAC and the City. Thus, on this record, we are assured that the jury could properly have rejected the City's interpretation of the terms at issue.

Despite the evidence to the contrary, the jury might have placed credence on the City's interpretation of the "defense" clauses, and then employed an estoppel theory in order to return a verdict for GLAC. The issue, then, is whether the trial court properly instructed the jury on an appropriate theory of estoppel.

██ ██ Although the term "estoppel" embraces a number of loosely defined theories, estoppel may generally be defined as "a bar which precludes a person from denying or asserting anything to the contrary of that which has, in contemplation of law, been established as the truth . . . by his own deed, acts, or representations, either express or implied." 28 AM. JUR. 2d *Estoppel and Waiver* § 1, at 600 (1966). The application of "[e]stoppel rests largely on the facts and circumstances of the particular case." *Monadnock School District v. Fitzwilliam*, 105 N.H. 487, 489, 203 A.2d 46, 48 (1964). The party invoking estoppel has the burden of proving that its application is warranted, and "its existence is a question of fact to be resolved by the trier of fact. . . ." *Olszak v. Peerless Ins. Co.*, 119 N.H. 686, 690, 406 A.2d 711, 714 (1979).

■ Two types of estoppel theories concern us here: promissory and equitable estoppel. Traditionally, courts have applied promissory estoppel in order to enforce promises when consideration is lacking, such as in cases involving gratuitous promises, charitable subscriptions and certain intra-family promises. J. CALAMARI AND J. PERILLO, THE LAW OF CONTRACTS, §§ 6-1 to -3 (3d ed. 1987). More recently, however, its application has been expanded to enforce promises underlying otherwise defective contracts and promises made during the course of preliminary negotiations. In some instances, it has been employed to provide a remedy for reliance upon offers subsequently withdrawn. CALAMARI AND PERILLO, *supra* § 6-5. But, in all instances, application of promissory estoppel is appropriate only in the absence of an express agreement. It serves to impute contractual stature based upon an underlying promise, and to provide a remedy to the party who detrimentally relies on the promise. 2A CORBIN ON CONTRACTS § 196A, at 55–56 (Supp. 1991).

■■ Equitable estoppel, on the other hand, does not involve a promise. Rather, it serves to "forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon." 28 AM. JUR. 2d *Estoppel and Waiver* § 28, at 629. In other words, a wrongdoer may be estopped from making assertions, even if true, which are contrary to acts and representations previously made which are reasonably relied upon by the wronged party. *See* 2A CORBIN ON CONTRACTS, *supra* at 35 (equitable estoppel arises from non-promissory conduct, actions, misrepresentations, and other language). Significantly, equitable estoppel is applied even when the parties memorialize their agreement in an express contract. *See Olszak v. Peerless Ins. Co.,* 119 N.H. 686, 406 A.2d 711 (1979) (estoppel applied in order to prevent insurance company from applying terms of the contract to deny coverage in light of prior representations and actions).

■ Once more, we consider the court's instructions, bearing in mind that the instructions should identify the material factual issues and inform the jury of the applicable legal standards. *Johnston v. Lynch,* 133 N.H. at 89, 574 A.2d at 940. Instructions are adequate if, taken as a whole, "[they] fairly present[ ] the case to the jury in such a manner that no injustice was done to the legal rights of the litigants." *Poulin v. Provost,* 114 N.H. 263, 264, 319 A.2d 296, 298 (1974).

The court's initial charge to the jury first raised the issue of estoppel as follows:

"It is Great Lakes' claim that the City of Claremont was in breach of its lease and that because of representation made by the City and relied upon by Great Lakes, the City is estopped or prevented to claim any of the defenses that appear in the lease document."

This describes equitable estoppel. Equitable estoppel can legitimately prevent the application of contractual terms which are contrary to those previous acts and representations of the City which indicated to GLAC that the land was available to lease and was not encumbered by the ALP.

Later, however, the court instructed on promissory estoppel:

"If you find that the [C]ity made a promise which you should reasonably expect would lead the plaintiff to do something and if the plaintiff did do something in reliance on the City's promise, then the promise may be enforced."

Still later, after a chambers conference concerning the initial instructions, the court offered an additional charge, in part stating:

"If you find that based upon the evidence before you the plaintiff, Great Lakes Aircraft Company, Inc. has met its burden of proof on its claim of estoppel, you may find that the City is estopped to assert such defenses it may raise by the written terms of the lease."

After briefly deliberating, the jury asked for clarification on estoppel. The court responded by first reading to the jury the preamble and the five counts of GLAC's complaint, followed by a more specific explanation of estoppel:

"[E]stoppel arises when one is forbidden by law to speak against his own act or deed . . . [GLAC] claims that because of representations made by the City and relied upon by Great Lakes, the City is estopped to claim any of the defenses . . . that appear in the lease document."

The City's claim that these instructions state an application of promissory estoppel is without merit. In reviewing jury instructions, we read them as a whole. *State v. St. John*, 129 N.H. 1, 3, 523 A.2d 26, 28 (1986) (instructions reviewed in their entirety not by looking at single instruction in isolation). The court's single description of promissory estoppel was soundly redressed by two successive supplemental instructions clearly describing equitable estoppel.

■ The City's concern that the estoppel claim was used offensively by GLAC as a basis for establishing liability, in conflict with

our decision in *Town of Nottingham v. Lee Homes, Inc.*, 118 N.H. 438, 388 A.2d 940 (1978), is likewise unfounded. The trial court, in the initial chambers conference, clearly stated that its intention was not to allow the jury to find liability, but rather, to allow GLAC to estop the contractual "defenses." Giving the two additional instructions to the jury on estoppel satisfied the trial court that the jury would properly apply estoppel, and we have no reason to believe that equitable estoppel improperly provided an affirmative ground for awarding damages.

The only remaining question is whether GLAC presented sufficient evidence to support an application of equitable estoppel. We conclude that it did.

 The moving party must prove four essential elements: first, a representation or concealment of material facts made with knowledge of those facts; second, the party to whom the representation was made must have been ignorant of the truth of the matter; third, the representation must have intentionally, or through culpable negligence, induced the other party to rely upon it; and fourth, the other party must have been induced to rely upon the representation to his or her injury. *City of Concord v. Tompkins*, 124 N.H. 463, 467–68, 471 A.2d 1152, 1154 (1984); 28 AM. JUR. 2d *Estoppel* § 33, at 640–41.

The first element—representation of fact with knowledge of its falsity—is the only element seriously at issue. Yet, it is easily proved. In the spring of 1985, Lurvey wrote to the FAA in an effort to change the designation of a two-acre parcel of land in the northwest quadrant from future aviation growth to light industry in order that the City could lease the parcel to a third party. The FAA granted approval, subject to certain contingencies, including the redesignation of a like amount of "light industrial" land to future "airport use." The FAA approval also stated:

> "[O]ur support of this proposal should not be construed as setting a precedent. The grade on this particular parcel warranted a change in designation, but the remainder of the land designated on your ALP for future airport purposes is truly prime airport land and should be protected and reserved for such purposes at any cost. . . ."

 Thus, the City's representation to GLAC that the land was available to lease was false. The City, by placing priority in maintaining compliance with the FAA agreements, encumbered the lot in a manner that was bound to affect GLAC's use of the land. Certainly,

the City was aware of its agreement with the FAA. The record amply supports the conclusion that the jury could legitimately have found that all of the elements of equitable estoppel were satisfied.

We next consider count IV, which alleges that the City breached an implied covenant of good faith and fair dealing by failing to obtain the FAA waivers in a timely manner on GLAC's behalf. In *Centronics Corp. v. Genicom Corp.*, 132 N.H. 133, 562 A.2d 187 (1989), we recognized that New Hampshire has "not merely one rule of implied good faith duty . . . [but rather] a series of doctrines, each of them . . . serving markedly different functions." *Id.* at 139, 562 A.2d at 190. The various implied good-faith obligations fall into three general categories, the first dealing with conduct in contract formation; the second addressing termination of at-will employment contracts; and the third dealing with the limitation of discretion in contractual performance. *Id.*

The City, addressing the third category, claims that the trial court erroneously submitted count IV to the jury, because the lease agreement does not endow the City with a "degree of discretion in performance" which could be exercised to adversely affect GLAC's interest in the lease. The City's reading of the rule, however, ignores the underlying principle and, consequently, fails to reflect the full scope of the rule. While the third category is comparatively narrow, its broader function is to "exclud[e] behavior inconsistent with . . . the parties' agreed-upon common purpose and justified expectations." *Id.* at 140, 562 A.2d at 191.

The City attempts to negate its good faith obligation by turning to the express terms of the lease. Specifically, it offers paragraph 12 to eliminate a good-faith obligation to obtain the FAA waivers. The relevant section of paragraph 12 provides:

> "Lessor, at the expense of Lessee, will cooperate with Lessee and execute any documents or pleadings legally required for any [contest of an imposition of any legal requirement] provided that any such cooperation or execution will not impose any obligation on Lessor."

The applicability of this provision to the issue before us is dubious. GLAC had no basis to challenge the FAA's threat of denying federal funding to the City. Consequently, the City retained the authority to choose whether or not to obtain the waiver which bore so directly on the purpose and expectations of the parties under the lease. Such authority constitutes "a degree of discretion in performance sufficient to deprive [GLAC] of a substantial proportion of the agree-

ment's value." *Centronics Corp. v. Genicom Corp.*, 132 N.H. at 143, 562 A.2d at 193. Thus, the court did not err in submitting count IV to the jury.

Briefly, the City argues next that the trial court erred in not dismissing count V which alleges that, by failing to obtain the formal FAA waivers in a timely manner, the City breached an implied-in-fact duty to cooperate with GLAC in the construction of its building. We conclude that the trial court properly allowed the count to go before the jury, and that sufficient evidence supports a verdict for GLAC on this count.

■ The recognition of an implied-in-fact duty of cooperation in this case is consistent with established principles of contract law. In general, "[i]f a contract is such that a certain performance by one party is necessary in order to earn the compensation that has been promised him, and that performance can not be rendered without the active co-operation of the other party, a promise to render such co-operation will usually be implied." 3 CORBIN ON CONTRACTS § 570, at 346. The duty is implied in order to "enforce the reasonable expectations of [the] parties . . . [by allowing] courts to look to the substance rather than to the form of the agreement, and to hold that substance controls over form." *Id.* at 386 (Supp. 1991). The extent of such a duty is limited by the requirements of good faith, and its application is further narrowed by requiring the fact finder to make a factual determination of the parties' fundamental expectations underlying the express agreement. When the fundamental expectations of a party are hindered, and the act of one contracting party can restore the expectation, we will imply a duty to act. *Cf. Centronics Corp. v. Genicom Corp.*, 132 N.H. at 139, 562 A.2d at 190 (standards of conduct in contract formation imply a good faith duty to correct subsequently discovered error).

■ Here, GLAC's basic understanding underlying its agreement to lease land from the City was that it would be able to construct a manufacturing facility. Once the jury found that the City issued the stop-work order in contravention of the fundamental expectations of GLAC, it was proper to charge the City with a duty to obtain the formal waivers in order to ensure that construction could proceed as anticipated by the parties at the time they entered into the lease. The evidence tending to show the City's delay in contracting with Dufresne-Henry, and the resulting delay in updating the ALP, is sufficient to support a finding that the City breached its duty of cooperation.

■ Finally, the City claims that the trial court erred in excluding certain offers of evidence. "A trial court's decision whether or not to admit certain evidence will not be disturbed unless it is 'clearly untenable or unreasonable to the prejudice of the case.'" *State v. Jones*, 133 N.H. 562, 564, 578 A.2d 864, 865 (1990) (citation omitted). Upon reviewing the record, we conclude that the City has failed to satisfy its burden, and we will not disturb the trial court's rulings.

## C. Damages

■ ■ The City challenges the damages award, claiming that consequential damages were unforeseeable. In reviewing damages awards, we will consider the evidence in the light most favorable to the prevailing party, and we will not disturb the decision of the fact-finder unless it is clearly erroneous. *Petrie-Clemons v. Butterfield*, 122 N.H. 120, 124, 441 A.2d 1167, 1170 (1982). "In order for a party to recover consequential damages, his injury must follow the breach in the natural course of events, or the evidence must specifically show that the breaching party had reason to foresee the injury." *Salem Engineering & Const. Corp. v. Londonderry School Dist.*, 122 N.H. 379, 384, 445 A.2d 1091, 1094 (1982).

In this case, substantial evidence supports a finding that the City could reasonably foresee the resulting financial injury to GLAC by its breach of the lease agreement. Having been involved in grant applications, lease negotiations, and a collective effort to find a manufacturing site for GLAC, the City had more than a casual understanding of GLAC's business prospects.

The City's understanding of the high stakes is clearly evinced by its efforts during lease negotiations to share in the expected profits. While ultimately rejected by GLAC, the City proposed a long-term payment schedule as follows:

> "*Amount and Time of Payments.* Lessee will pay to lessor an additional rent after 20 years in the amount of 1% annual gross revenues, plus ½% of any portion of the second five (5) million dollars in annual gross revenues, and plus ¼% of all gross revenues in excess of ten (10) million dollars of [*sic*] [GLAC] per year for each year from year 21 to year 100 of this lease, to be paid in one lump sum at the end of each year. Lessee shall provide a profit and loss statement annually to document the amount to be paid."

■ Moreover, the City was aware, at the time of the breach, that GLAC did not have an alternative or temporary manufacturing

facility and that business could not continue until the completion of construction. Consequently, the City was aware that, by halting construction and prolonging the delay of GLAC's operations, profits would be lost. In fact, during the pendency of the stop-work order, the City wrote to Gerald D'Amico, project manager for Dufresne-Henry, expressing its concern, in part, as follows:

> "We are extremely concerned about any further delay in the construction currently underway by Great Lake . . . [W]e wish to point out that the company bought this lease and currently is unable to continue in its manufacturing processes, and therefore, it may endure financial hardship with undue delay."

Thus, we will not disturb the jury's award of damages on the basis of unforeseeability.

■ The City also argues that the jury should not have been instructed to consider lost profits, because such losses were too speculative and uncertain to be determined. While the law does not require absolute certainty for recovery of damages, *Petrie-Clemons v. Butterfield*, 122 N.H. at 125, 441 A.2d at 1171, we will uphold an award of damages for lost profits only if sufficient relevant data supports a finding that profits were reasonably certain to result. *Hydraform Prods. Corp. v. American Steel & Alum. Corp.*, 127 N.H. 187, 197, 498 A.2d 339, 345 (1985). The facts in the record of this case are not sufficient to support a finding that GLAC suffered lost profits from its inability to produce the Champion line of aircraft. *See Petrie-Clemons v. Butterfield*, 122 N.H. at 126, 441 A.2d at 1171 (lost profits appropriate when plaintiff is an on-going manufacturing entity with a four-year history of profits and an acquired client base); *Van Hooijdonk v. Langley*, 111 N.H. 32, 33–34, 274 A.2d 798, 800 (1971) (two-month record of profits for new seasonal business provides sufficient data to recover lost profits when two months is equivalent to one season).

The evidence reveals that Champion had been purchased by Bellanca, Inc. in the 1960's and manufactured airplanes in Wisconsin until 1979. By 1980, the rights to acquire Champion had been purchased by Jack Burden of Texas; however, no aircraft were produced, and as a result of other business failings, the Champion assets were ultimately purchased at a bankruptcy auction by Burden's bank and later sold to Dr. Charles Denham in July 1985 for $205,000.

GLAC commenced negotiations to purchase Champion from Dr. Denham shortly before entering into the lease agreement with the

City. The negotiations, however, were never manifested in a written purchase agreement, and the actual terms remained undefined. Agreement among the potential purchasers as to the form and ownership rights of the new business had not been completed. Moreover, GLAC's financial ability to purchase Champion depended upon a bond issue, from which it would realize four million dollars: a financing plan which, although beyond a conceptual stage, was still in flux.

At trial, Dr. Alan McCausland, GLAC's damages expert, based his lost profit estimates on a hypothetical business entity producing Great Lakes and Champion aircraft and on forecasted profits from 1986 through 1995. The recent production of the Great Lakes aircraft might have yielded sufficient data to project future profits of a GLAC as it had existed until 1985 when production ceased at its Washington Street plant. But, according to McCausland, a comparison of the proposed business with the former GLAC would be like comparing "apples and pears." McCausland's projections did not include the recent 1984 and 1985 Great Lakes production data because the report essentially concerned the operation of an entirely new business. Yet, the realization of the new business still depended upon successfully allying potential investors, obtaining sufficient capital from a bond issue not within GLAC's direct control, and further negotiating the purchase of the assets and rights of Champion, which at that time was still an independent business.

To the extent that the damages award includes lost profits from the Champion production, we hold that there was insufficient evidence from which the jury could reasonably find that the damages arose from the defendant's breach of the contract. We reverse and remand for determination of damages consistent with this opinion.

*Affirmed in part; reversed in part; remanded for determination of damages.*

JOHNSON, J., did not sit; the others concurred.