Hillsborough,
May 3, 1938.

MARKAR G. MARKARIAN *v.* MICHAEL BARTIS & a.

*Wason, Guertin & Leahy* (*Mr. Guertin* orally), for the plaintiff.

*Robert J. Doyle* (by brief and orally), for the defendants.

MARBLE, J.   The defendants contend that their motion should have been granted because there is no evidence to support the referee's findings, because the findings are contradictory, because the receipt dated December 2, 1932, is in part a contract, the terms of which cannot be varied by parol, and because the plaintiff's agreement "to handle litigation on a percentage basis is champertous and void."

The testimony has not been transferred, and no exceptions to the admission of evidence appear to have been taken. It must therefore be presumed that the findings were "based upon an adequate amount of competent evidence." *Durand* v. *Cohen*, 86 N. H. 575, 576.

The findings are consistent. The only reasonable interpretation to be given the referee's explanation of the verdict is that, although the details of computation indicated in the original report may be subject to some criticism, yet the real basis of the decision is the value of the plaintiff's services to the defendants. Contracts for attorneys' services stand on the same ground and are governed by the same rules as other similar contracts for services. *Dodge* v. *Janvrin*, 59 N. H. 16.

The document dated December 2, 1932, is not a contract in any sense of the term. It comprises the simple recital that the plaintiff has received $250 for "professional services in settlement of" certain cases. It is a receipt, and ". . . no principle, perhaps, is better settled than that receipts may be explained by parol, and their true meaning and purpose shown." *Furbush* v. *Goodwin*, 25 N. H. 425, 444, 445. For cases to the same effect, see Hening's Digest, *p.* 662.

There is an express finding to the effect that the plaintiff, when he advised the bringing of the suit for contribution, acted honestly and on reasonable grounds. The referee correctly ruled that the plaintiff, having been discharged before the termination of the suit, was entitled to the value of his services even though he had agreed to accept a percentage of the amount recovered in the action.

In *Taylor* v. *Gilman*, 58 N. H. 417, the common law against maintenance and champerty is declared to be in force in this State, and in *Butler* v. *Legro*, 62 N. H. 350, it is held that an attorney's contract to prosecute an action "on shares" is "contrary to public justice and professional duty," that it tends "to extortion and fraud," and is "champertous and void."

The earlier case of *Christie* v. *Sawyer*, 44 N. H. 298, holds, however, that an attorney may render services and advance money in carrying on a lawsuit for a person without property, upon an agreement that he shall first be paid from the funds recovered, and that this arrangement is neither maintenance nor champerty.

Maintenance has been defined as "a malicious or officious intermeddling with a suit" that does not belong to one, "by maintaining or assisting either party with money, or otherwise, to prosecute or defend it." *Christie* v. *Sawyer*, *supra*, 303.

In maintenance "no personal profit is expected or stipulated," but in champerty "there is a bargain with the plaintiff or defendant by which the champertor is to carry on the suit at his own expense and is to derive some profit out of the thing sued for if he prevails." *Sampliner* v. *Company*, 255 Fed. 242, 247. A maintainer has been characterized as "one who stirs up vexatious suits to which he is not a party," and a champertor as "one who does so for pecuniary gain." Radin, "Maintenance by Champerty," 24 Cal. Law Rev. 48, 66, 67.

"The English doctrine of maintenance arose from causes peculiar to the state of the society, in which it was established. The great reason for the suppression of champerty and maintenance, was an apprehension, that justice itself, was endangered by these practices . . . . The power of great men, to whom rights of action were transferred, in order to obtain support and favor in suits brought to assert those rights; the confederacies which were thus formed; and the oppression which followed from the influence of great men, in such cases, are themes of complaint, in the early books of the English law." *Thallhimer* v. *Brinckerhoff*, 3 Cow. 623, 644.

Much of that law "is of merely curious interest today." *Cardozo, C. J., In the Matter of Gilman*, 251 N. Y. 265, 270. Its "psychological background" is the assumption of medieval society that "litigation is at best a necessary evil, and litigiousness a vice." 24 Cal. Law Rev. 48, 68. There is scant reason for the retention of the doctrine in anything like its original severity in modern times.

"The statutes for the limitation of actions, the statute of frauds, the extension of the action for malicious prosecutions, and the costs given against unsuccessful parties, have all taken place since the law of maintenance was established; and all these alterations have contributed to prevent or punish groundless and vexatious litigation." *Thallhimer* v. *Brinckerhoff, supra,* 645.

In the case of *Christie* v. *Sawyer*, 44 N. H. 298, 303, the court, though "not prepared to say that the law, relative to maintenance and champerty is not part of our law," nevertheless suggests that the law may "be administered in a very different spirit here at this day" from the spirit in which it was administered "in a different state of society." As early as 1828 some relaxation of the early English rule was countenanced. In *Shapley* v. *Bellows*, 4 N. H. 347, 355, decided in that year, it is said that there is a general understanding between attorneys and their clients "that the former shall retain their fees and disbursements out of the sum that may be recovered of the opposite party," that it is not uncommon for attorneys to

"commence actions for poor people and make advances of money necessary to the prosecution of the suit upon the credit of the cause," and that thus "a person in indigent circumstances is enabled to obtain justice in cases where, without such aid, he would be unable to enforce a just claim."

It is held in *Jordan* v. *Gillen*, 44 N. H. 424, that the assignment to an attorney of a claim for unliquidated damages, founded on a tort, the assignment being fairly executed between attorney and client in consideration of a precedent debt, is neither champertous nor against public policy. Reference is there made to the following statement of Lord *Abinger* in *Findon* v. *Parker*, 11 M. & W. 675, 681: "The law of maintenance, as I understand it upon the modern constructions, is confined to cases where a man improperly, and for the purpose of stirring up litigation and strife, encourages others either to bring actions, or to make defences which they have no right to make."

In 1903 the House of Representatives was advised that the Governor and Council, by virtue of certain legislative enactments, had authority in 1897 to enter into a contract with an attorney for the collection of a claim in the State's favor, whereby the attorney was to "receive for his legal services in and about said matter a sum equal to fifteen per cent of the entire sum collected, payable only out of any sums that may be collected hereunder, and without any liability on the part of the state for expenses in connection therewith." *Opinion of the Justices*, 72 N. H. 601. In 1911 the claim of an attorney for a contingent interest in a recovery under the workmen's compensation act, if approved by the Superior Court, was made an enforceable lien on such recovery. P. L., c. 178, s. 37.

Thus, today, in this State, the mere fact that an attorney's fees are to be contingent upon his success and are to constitute a share of the proceeds recovered can scarcely be said to offend the public conscience. It is of course true that a particular contract for such fees may be oppressive and unconscionable or subversive of public morals. When such an agreement is attacked, it is the duty of the court to declare it invalid. *Edgerly* v. *Hale*, 71 N. H. 138. If all agreements for contingent fees were of this nature, an arbitrary rule would be imperative.

"But this is not so at all. There is no necessary and inevitable connection between improper litigation, hard bargains and solicitation on the one hand and the acquisition by a third party of an interest in a litigated case, on the other. Surely it would be more

rational and sensible to say that champerty is an evil when, and only when, it leads to these evils. When it does not, it is not merely unobjectionable, but may actually serve a good purpose, as so many courts have expressly and quite justifiably found.

"It is quite true that it readily lends itself to the accomplishment of the wrongful purposes just specified. But the real source of such purposes goes much deeper in social life than the mere existence of an instrumentality. Fraud and overreaching have never been abolished by outlawing the particular form they have assumed at any given time. If champertous contracts can serve any good purpose—and they apparently can—it is not foresight, but the infantile psychosis of 'all-or-nothing' which demands that we discard them altogether." 24 Cal. Law Rev. 48, 72.

It is our conclusion that, except in those cases where it is found as a fact that litigious strife is sought to be promoted, the rule against champerty and maintenance is not now in force in this jurisdiction.

It follows that the agreement as to the plaintiff's compensation for services in the suit for contribution, if made, was not illegal. The plaintiff, on being discharged, was therefore entitled to recover what his services were reasonably worth. *Clark* v. *Manchester*, 51 N. H. 594.

*Judgment on the referee's report.*

All concurred.