Belknap
No. 2008-622

ANTHONY L. LIVINGSTON

v.

18 MILE POINT DRIVE, LTD. d/b/a 18 MILE POINT DRIVE LIMITED PARTNERSHIP & a.

Argued: February 12, 2009
Opinion Issued: April 24, 2009

*Boynton, Waldron, Doleac, Woodman & Scott, P.A.*, of Portsmouth (*Charles B. Doleac* and *Heather Neville* on the brief, and *Ms. Neville* orally), for the plaintiff.

*Upton & Hatfield, LLP*, of Portsmouth (*Russell F. Hilliard* on the brief and orally), for the defendants.

DALIANIS, J. The defendants, 18 Mile Point Drive, Ltd. d/b/a 18 Mile Point Drive Limited Partnership, Walker G. Harman and Alfred W. Bowman, Jr., appeal the decision of the Superior Court (*Smukler*, J.), entered after a bench trial, which ordered specific performance of the option held by the plaintiff, Anthony L. Livingston, to purchase a 1.5-acre lot from the defendants. We affirm.

The record supports the following facts. The plaintiff owned twenty-two acres of land in Meredith, which he agreed to sell to the defendants, with an option to repurchase a 1.5-acre lot. The twenty-two acres had been in the plaintiff's family for many years. Originally, he sought to sell only nineteen acres, keeping three acres for himself on which he planned to build a home. After negotiation, he agreed to sell the entire twenty-two-acre parcel, with an option to repurchase the 1.5-acre lot.

The parties' agreement was memorialized in a purchase and sale agreement (P & S) and a separate option agreement. The P & S granted the plaintiff an option to purchase the 1.5-acre lot for one dollar, and provided that the option would be valid for one year from the date of final subdivision approval.

The option agreement included these same provisions. Unlike the P & S, however, it also provided that it would cost the plaintiff one dollar to retain the option. The option agreement also provided that the one-dollar purchase price of the option would be credited to the purchase price for the

lot itself. Thus, the total amount of money the plaintiff was to pay for both the option and the lot was one dollar.

The option agreement specified that if the defendants were unable to deliver a deed to the 1.5-acre lot within five years, they would be required to pay the plaintiff $75,000. It further specified that to exercise the option, the plaintiff was required to give written notice to the defendants by certified mail, return receipt requested, and that the option would become effective upon receipt of this notice.

The parties negotiated the option agreement through their attorneys. Attorney Patrick Wood represented the plaintiff; the defendants were represented by Attorney Stephan Nix.

The closing took place on September 17, 2002. At the closing, the plaintiff said, "I really want this property," and Attorney Wood handed Attorney Nix $1.00, saying something to the effect of, "[L]et's take care of this right now." Attorney Wood wrote "Paid 17 Sept. 2002" next to paragraph five of the option agreement, which pertained to the payment required to retain the option. Attorney Nix wrote "rec by STN 9/17/02" under Attorney Wood's notation, acknowledging receipt.

The plaintiff and Attorney Wood believed that, by paying $1.00 at the closing, the plaintiff had exercised his option to purchase the 1.5-acre lot. The plaintiff believed that when the defendants obtained subdivision approval, the agreement required them to convey the option lot to him.

On September 23, 2004, the plaintiff received a letter from Attorney Nix, which included a copy of the defendants' subdivision plan. The letter informed the plaintiff that the subdivision plan was before the planning board, and promised him that he would receive recorded copies of the plan and its registration with the Attorney General's Office. The letter also stated that upon receipt of the registration with the Attorney General's Office, "the lots will be available for conveyance."

The defendants' subdivision plan was approved on December 21, 2004, and recorded on December 27, 2004. On January 25, 2005, Attorney Nix forwarded copies of the approved plan and registration to the plaintiff. The defendants believed that based upon the option agreement, the term of the plaintiff's option began on December 27, 2004, and ended a year later, on December 27, 2005.

In early 2005, the plaintiff contacted Attorney Wood because he noticed that the defendants had begun conveying lots in their subdivision. In April 2005, Attorney Wood phoned Attorney Nix and sent an e-mail to him asking for an update. Attorney Nix testified that he must have talked to Attorney Wood after the e-mail, but could not specifically recall the conversation and had no notes of it.

Attorney Nix did speak with defendant Harman, however, who told Attorney Nix that it was his position that the defendants had met or exceeded their responsibilities by giving the plaintiff notice of the subdivision approval, and that it was up to the plaintiff to exercise his option. Harman did not believe that the defendants should respond to the e-mail inquiry and assumed that Attorney Wood would call again. Attorney Nix never sent Attorney Wood copies of his correspondence with the plaintiff or copies of the approved subdivision plan.

On June 2, 2006, the plaintiff wrote to Attorney Nix himself, stating that it appeared obvious that the subdivision had been approved and asking why there had been such a delay in conveying the 1.5-acre lot to him. In an August 7, 2006 letter, Attorney Nix informed the plaintiff that his earlier letters had constituted notice of subdivision approval and that the option term had expired, along with the plaintiff's rights thereunder. On September 26, 2006, Attorney Wood sought an extension of the option agreement, which was refused. The plaintiff's lawsuit followed.

The trial court assumed, without deciding, that, as the defendants argued, the plaintiff did not exercise his option to purchase pursuant to the terms in the parties' agreement. Nonetheless, the court ruled that equity required specific performance of the option agreement. The court found that the defendants breached the agreement's implied covenant of good faith and fair dealing when they failed to correct any misunderstanding that the plaintiff had about the status of the option and, specifically, when they failed to respond to Attorney Wood's inquiry in April 2005 as to the option's status.

The court found that the failure to respond to Attorney Wood's inquiry was "a conscious tactical decision based on [the defendants'] belief that it was up to the [plaintiff] to exercise the option and that if he did nothing, such an exercise would probably not happen." The defendants, the court ruled, "failed to speak when they knew or should have known that their silence misl[e]d and damaged the [plaintiff] by inducing him to refrain from acting in accordance with his consistent intent to exercise the option."

On appeal, the defendants first argue that the trial court erred by applying "equitable considerations" to allow the plaintiff to have the benefit of the option agreement, even though he failed to comply with it. The defendants contend that the trial court relied upon equitable principles to relieve the plaintiff of his obligations under the agreement. They imply that the trial court used the implied covenant of good faith and fair dealing to, in effect, rewrite the parties' option agreement. *See Olbres v. Hampton Coop. Bank*, 142 N.H. 227, 233 (1997) (rejecting trial court's implied legal conclusion that good faith required bank to refrain from setting off account until payments were overdue, court notes that "courts cannot make better

agreements than the parties themselves entered into or rewrite contracts merely because they might operate harshly or inequitably" (quotation omitted)). To the contrary, here, the trial court merely enforced the implied covenant of good faith and fair dealing when the court ruled that the defendants breached it by acting evasively and not cooperatively with the plaintiff.

In every agreement, there is an implied covenant that the parties will act in good faith and fairly with one another. *Richard v. Good Luck Trailer Court*, 157 N.H. 65, 70 (2008). In New Hampshire, there is not merely one rule of implied good-faith duty, but a series of doctrines, each of which serves different functions. *Great Lakes Aircraft Co. v. City of Claremont*, 135 N.H. 270, 293 (1992). The various implied good-faith obligations fall into three general categories: (1) contract formation; (2) termination of at-will employment agreements; and (3) limitation of discretion in contractual performance. *Id.* This case deals with the third category. While the third category is comparatively narrow, its broader function is to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations, *id.*, as well as "with common standards of decency, fairness and reasonableness." *Richard*, 157 N.H. at 70 (quotation omitted).

Although we have not stated so explicitly, our prior cases reveal that we will uphold a trial court's determination regarding the breach of the implied covenant of good faith and fair dealing unless it is not supported by the evidence or is legally erroneous. *See Albee v. Wolfeboro Railroad Co.*, 126 N.H. 176, 179 (1985) (holding that master's conclusion that no breach of implied covenant of good faith and fair dealing occurred did not constitute legal error); *Finlay v. Frederick*, 135 N.H. 482, 489 (1992) (affirming trial court's determination that party did not breach implied covenant of good faith and fair dealing in light of conflicting trial testimony and trial court's broad discretion to weigh witness testimony at trial); *Realco Equities, Inc. v. John Hancock Mut. Life Ins. Co.*, 130 N.H. 345, 350 (1988) (upholding master's finding that party did not breach implied covenant of good faith and fair dealing because it has support in record and reasonable person could have so found); *cf. Great Lakes Aircraft Co.*, 135 N.H. at 294 (evidence supported jury's finding that City breached duty of cooperation, which is part of the implied covenant of good faith and fair dealing).

The record supports the trial court's finding that the parties' agreed-upon common purposes and justified expectations included the expectation that the plaintiff would retain the 1.5-acre lot. As the trial court aptly found, the plaintiff's desire to retain this lot "was abundantly clear during all negotiations, as evidenced by the original listing information and

the P&S." That the parties expected the plaintiff to retain the lot was also evident from the fact that he could both retain the option and buy the lot for only one dollar. The parties' expectations, as evidenced by the agreement, were that if the defendants obtained subdivision approval, the plaintiff would retain the lot. The expectation was that the defendants would pursue subdivision approval with due diligence (within five years). If, for some reason, they failed to do this, the agreement required them to pay the plaintiff $75,000. As Attorney Nix testified, the $75,000 payment "was sort of a hammer held over the head so my client[s] would pursue . . . due diligence to get this subdivision done."

The record also supports the trial court's finding that the defendants behaved inconsistently with this expectation and, therefore, breached the implied covenant of good faith and fair dealing. The defendants knew or should have known that there was at least a potential misunderstanding about the status of the option when Attorney Wood contacted Attorney Nix in April 2005. Rather than respond to this inquiry, however, as the trial court found, and as the record demonstrates, the defendants "stonewalled."

■ The RESTATEMENT (SECOND) OF CONTRACTS further supports the trial court's determination. Section 205 of the RESTATEMENT (SECOND) OF CONTRACTS provides: "Subterfuges and evasions violate the obligations of good faith in performance even though the actor believes his conduct to be justified." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. *d* at 100 (1981). Among the types of bad faith recognized by courts are evasion of the spirit of the bargain and failure to cooperate in the other's performance. RESTATEMENT (SECOND) OF CONTRACTS, *supra* cmt. *d* at 100-01; *see Great Lakes Aircraft Co.*, 135 N.H. at 294. Section 205 of the RESTATEMENT (SECOND) OF CONTRACTS offers the following illustration, which mirrors the situation in this case:

> A suffers a loss of property covered by an insurance policy issued by B, and submits to B notice and proof of loss. The notice and proof fail to comply with requirements of the policy as to form and detail. B does not point out the defects, but remains silent and evasive, telling A broadly to perfect his claim. The defects do not bar recovery on the policy.

RESTATEMENT (SECOND) OF CONTRACTS, *supra* cmt. *d*, illus. 7, at 102.

■ Here, as in the above example, while the plaintiff's exercise of his option to purchase did not comply with the requirements of the option agreement "as to form and detail," in that it was not sent in writing and was exercised prematurely, the defendants never pointed this out to the plaintiff. Instead, they neglected to respond to the plaintiff's inquiry (sent

through his attorney) and chose to respond only after the time for exercising the option had elapsed. Under the circumstances of this case, the trial court reasonably could have found that the defendants acted evasively and breached the covenant of good faith and fair dealing.

To the extent that the defendants argue that, having concluded that they breached the implied covenant of good faith and fair dealing, the trial court erred by ordering specific performance, we disagree. "The propriety of affording equitable relief rests in the sound discretion of the trial court to be exercised according to the circumstances and exigencies of the case." *Blagbrough Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 46 (2007). We will uphold a trial court's equitable order unless its decision constitutes an unsustainable exercise of discretion. *Id.*

■■ We cannot say that the trial court unsustainably exercised its discretion by ordering specific performance in this case. "Generally, a decree of specific performance is intended to produce essentially the same effect as if the performance due under a contract were rendered." *Poland v. Twomey*, 156 N.H. 412, 416 (2007); *see* RESTATEMENT (SECOND) OF CONTRACTS, *supra* § 357 cmt. *a* at 163. Here, the trial court's equitable decree provided the parties with exactly what they bargained for under the option agreement. Under the unique circumstances of this case, we cannot say that this was an unsustainable exercise of discretion.

The defendants mistakenly rely upon *Fletcher v. Frisbee*, 119 N.H. 555 (1979), to support their assertion that the trial court erred by enforcing the option agreement. In *Fletcher*, we ruled that equity would give relief to a lessee who failed to exercise an option for lease renewal within the required time if the delay was slight, was not prejudicial to the landlord, and failing to grant relief to the tenant would result in hardship that would make literal enforcement of the renewal provision unconscionable. *Fletcher*, 119 N.H. at 558. *Fletcher* is inapposite, however, as it did not involve a breach of the implied covenant of good faith and fair dealing. The trial court in this case afforded the plaintiff equitable relief not because of the *Fletcher* factors but because it found that the defendants breached the implied covenant of good faith and fair dealing.

■ The defendants next assert that the trial court erred when it admitted and considered parol evidence to interpret the option agreement. We do not share the defendants' interpretation of the trial court's decision. Our review of the record reveals that the trial court did not admit parol evidence to vary the terms of the option agreement, but rather to interpret the notations written on the agreement by Attorneys Wood and Nix. These notations were not, in themselves, contracts, but rather comprised recitals regarding the one dollar bill tendered at the closing. *See Markarian v.*

*Bartis,* 89 N.H. 370, 372 (1938); *Bunker v. Company,* 84 N.H. 84, 87 (1929). As such, they are like receipts, which may be explained by parol evidence. *See Markarian,* 89 N.H. at 372; *Bunker,* 84 N.H. at 87-88.

Finally, the defendants contend that the trial court erred when it precluded them from discovering communications between the plaintiff and Attorney Wood. The decision to disallow pretrial discovery is within the sound discretion of the trial judge, and we will uphold it unless it is an unsustainable exercise of discretion. *Bennett v. ITT Hartford Group,* 150 N.H. 753, 760 (2004).

The defendants first assert that the information they sought was not privileged because it was relevant to a claim that they assert the plaintiff made against Attorney Wood. *See* N.H. R. Ev. 502(d)(3). Under New Hampshire Rule of Evidence (Rule) 502(b), "[a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client," including communications between the client and his attorney. Rule 502(d) sets forth five categories of communications that are not privileged. Rule 502(d)(3) "establishes an exception where the communication is relevant to a dispute between client and lawyer." N.H. R. Ev. 502 Reporter's Notes.

██ Contrary to the defendants' assertions, the trial court reasonably could have found that the plaintiff did not make a claim against Attorney Wood. Attorney Wood testified that "[n]o claim has been made against [him]." Based upon this evidence, the trial court reasonably could have found that there was no dispute between the plaintiff and Attorney Wood and that Rule 502(d)(3) did not apply to the communications at issue.

██ Alternatively, the defendants argue that even if the communications were privileged, the plaintiff impliedly waived the privilege by putting them at issue in the case. An "at-issue" waiver of the attorney-client privilege is limited to circumstances in which the privilege-holder injects the privileged material itself into the case, such that the information is actually required for resolution of the issue. *Bennett,* 150 N.H. at 761. We have applied this narrow exception to the attorney-client privilege in the case of ineffective assistance of counsel, because such claims went to the "core of attorney-client communications." *Id.* (quotation omitted). In *Petition of Dean,* 142 N.H. 889, 891 (1998), for instance, we held that a motion for ineffective assistance of counsel, as a matter of law, constitutes a limited waiver of the attorney-client privilege.

██ The defendants contend that the plaintiff injected privileged material into the case because, in presenting his case, he relied upon Attorney

Wood's testimony concerning his preparation for the 2002 closing, the closing itself and his actions on the plaintiff's behalf. The trial court reasonably could have concluded that this was insufficient to demonstrate an "at-issue" waiver of the attorney-client privilege. *Bennett*, 150 N.H. at 761.

*Affirmed.*

BRODERICK, C.J., and DUGGAN and HICKS, JJ., concurred.