NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2020-0113

CHAD SHORT AND KELLY SHORT

v.

JOHN LAPLANTE AND LORI LAPLANTE, AS TRUSTEES OF THE LAPLANTE FAMILY REVOCABLE TRUST

Argued: May 5, 2021
Opinion Issued: August 27, 2021

Dickinson & Silverman, PLLC, of Concord (Gregory L. Silverman on the brief and orally), for the plaintiffs.

Cook, Little, Rosenblatt & Manson, p.l.l.c., of Manchester (Kathleen M. Mahan on the brief and orally), for the defendants.

HICKS, J. The plaintiffs, Chad and Kelly Short (Buyers), appeal an order of the Superior Court (Kissinger, J.), issued after a bench trial, denying their requests for specific performance and attorney's fees and costs in connection with an alleged contract to purchase real estate from the defendants, John and Lori LaPlante, as trustees of the LaPlante Family Revocable Trust (Sellers). We affirm.

I.  Facts

The following facts either were found by the trial court or relay the content of documents in the record.  The Sellers have owned the subject property in Concord for several years.  They listed it in the spring of 2018 because of Ms. LaPlante's debilitating allergies to the birch and oak trees on the property.  At the same time, the Sellers sought a new home that had limited exposure to birch and oak trees and a garage sufficiently large to house vehicles and large equipment used in Mr. LaPlante's employment.  Over the course of several months, the Sellers viewed more than 100 properties online and visited 15-17 houses in person.  However, by late May 2018, they had not found a home that met their search criteria.

The Buyers visited the Sellers' home for the first time on May 24, 2018, and that day submitted an offer to purchase it for $690,000.  After negotiations, but before the purchase and sale agreement (P&S) was executed, the parties agreed that the Buyers would purchase the property for $690,000 and would submit $10,000 as a deposit, and the Sellers would furnish up to $7,250 in closing costs.

On June 1, the Sellers located a property in Stratham that they thought would suit their needs.  They submitted an offer on that property on June 3.  Also, on June 3, the parties fully executed the final P&S for the Sellers' Concord property, which included the following provision (the Disputed Provision): "This agreement is subject to Sellers finding suitable housing no later than July 14, 2018."  On June 5, the Sellers sent an email apologizing to the Buyers "for wanting to cancel the P&S . . . at this stage."  The Sellers explained that they no longer needed to move from the property because Ms. LaPlante no longer had allergy symptoms as a result of having had allergy injections for several months.  Later that day, the Sellers sent another email to the Buyers, through the parties' realtors, stating:

> We were disappointed to hear you want to proceed with the process of purchasing our home.  We would like to point out that section 19 of our Purchase and Sales Agreement . . . lists a provision that the "agreement is subject to Sellers finding suitable housing no later than July 14, 2018".  Given our original decision to sell was directed by health issues that have since subsided and our specific criteria for a suitable home, we are not confident we would be successful in finding "suitable housing" prior to July 14, 2018.  In an effort of good faith, we respectfully provide you with this information so you may agree to cancel the P&S Agreement rather than extend the process to July 14, 2018.

The Buyers interpreted the Sellers' attempt to cancel the P&S as an indication that the Sellers had received a better offer. The Buyers subsequently brought this action.

The trial court found that the P&S was not "a binding and enforceable contract" because "[t]here was no meeting of the minds regarding the Disputed Provision." Having found that the parties lacked an enforceable contract, the court denied the Buyers' claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The court also denied the requests of the parties for attorney's fees and costs, finding that neither the Buyers nor the Sellers "displayed bad faith or vexatious, wanton, or oppressive motives" in the litigation. The Buyers unsuccessfully moved for reconsideration, and this appeal followed.

II. Analysis

We will uphold the trial court's findings and rulings unless they lack evidentiary support or are legally erroneous. N.H. Fish & Game Dep't v. Bacon, 167 N.H. 591, 596 (2015). "Our standard of review is not whether we would rule differently than the trial court, but whether a reasonable person could have reached the same decision as the trial court based upon the same evidence." Id. (quotation omitted). "Thus, we defer to the trial court's judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence." Id. (quotation omitted). We review the trial court's legal rulings and its application of law to fact de novo. See Bursey v. CFX Bank, 145 N.H. 126, 129 (2000).

A. Meeting of the Minds

The Buyers first argue that the trial court incorrectly found that there was no "meeting of the minds" with regard to the Disputed Provision. For the purposes of this appeal, we assume without deciding that the Buyers are correct.

B. Ambiguity

The Buyers next assert that the Disputed Provision is ambiguous. The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a question of law for this court to decide. Duke/Fluor Daniel v. Hawkeye Funding, 150 N.H. 581, 582 (2004). Accordingly, we review the trial court's interpretation of the contract de novo. Id.

Under the Disputed Provision, the P&S was "subject to" the Sellers' finding "suitable housing" by July 14, 2018. As the Buyers acknowledge, the phrase "subject to" indicates that the P&S was contingent upon the Sellers' finding "suitable housing" by July 14. See Webster's Third New International

3

Dictionary 2275 (unabridged ed. 2002) (defining "subject" in pertinent part as "likely to be conditioned, affected, or modified in some indicated way[,] having a contingent relation to something and usu. dependent on such relation for final form, validity, or significance" such as "a treaty [subject to] ratification"). In other words, "finding suitable housing" was a condition precedent to the Sellers' obligations to perform under the P&S — to sell their home to the Buyers. See Renovest Co. v. Hodges Development Corp., 135 N.H. 72, 78-79 (1991). The term "subject to" commonly indicates an express condition precedent. See Bonneville v. Bonneville, 142 N.H. 435, 438 (1997); Renovest Co., 135 N.H. at 78. While "conditions precedent are not favored," the plain language of the Disputed Provision indicates that one was intended. Bonneville, 142 N.H. at 438; see Bruyere v. Jade Realty Corp., 117 N.H. 564, 565 (1977) (explaining that "the grant of bank financing was a condition precedent to the obligations under the contract" where the real estate P&S provided that it was "subject to financing at 7¾% for thirty (30) years" (quotation omitted)); Makris v. Nolan, 115 N.H. 135, 135-36 (1975) (interpreting the phrase "subject to bank financing" in a contract to purchase real estate as a condition precedent).

The Buyers argue that the Disputed Provision failed to grant the Sellers "termination rights," and, alternatively, that to exercise their "termination rights," the Sellers had to notify the Buyers of their intent to terminate the agreement. In addition, the Buyers contend that the Disputed Provision is ambiguous because it is "silent on what rights either party has, if any, if the [Sellers] failed to fulfill the contingency of finding 'suitable housing no later than July 14.'" We are not persuaded. As a condition precedent, the Disputed Provision was either satisfied or not; the Sellers either found suitable housing no later than July 14, or they did not. Given that no party argues that the Sellers found suitable housing by July 14, 2018, the condition precedent failed. Upon the failure of the condition precedent — the Sellers' "finding suitable housing no later than July 14, 2018" — the Sellers had no duty to perform, and the P&S was unenforceable as a matter of law. See In re Estate of Kelly, 130 N.H. at 781-82.

Nor are we persuaded that the Disputed Provision is subject to more than one reasonable interpretation and, therefore, is ambiguous. Found. for Seacoast Health v. Hosp. Corp. of America, 165 N.H. 168, 172 (2013) ("The language of a contract is ambiguous if the parties to the contract could reasonably disagree as to the meaning of that language." (quotation omitted)). Rather, we agree with the Sellers that the only reasonable interpretation of the Disputed Provision is that the P&S became unenforceable upon the non-occurrence of the contingency.

Having concluded that the Disputed Provision is unambiguous, we need not address the Buyers' appellate arguments premised upon the opposite conclusion, that the Disputed Provision is ambiguous. Specifically, we need

not address the Buyers' assertions that we must look to extrinsic evidence of the parties' conduct before and after executing the P&S to interpret the Disputed Provision, or that the Sellers are bound by the Buyers' understanding of the Disputed Provision. See Sherman v. Graciano, 152 N.H. 119, 122 (2005) ("[W]e will reverse the determination of the fact finder where, although the terms of the agreement are unambiguous, the fact finder has relied improperly upon extrinsic evidence in reaching a determination contrary to the unambiguous language of the agreement.").

### C. Breach of Contract and Breach of the Implied Covenant

Alternatively, the Buyers contend that the Sellers breached the P&S and the implied covenant of good faith and fair dealing. Although the trial court did not decide these issues because it concluded that the parties had no contract to begin with, the court made factual findings that bear on them and are binding on us because they are supported by the evidence. See Bacon, 167 N.H. at 596.

#### 1. Breach of Contract

The Buyers first assert that the Sellers breached the P&S because "they never declared [it] terminated by July 14 as a matter of law." They argue that, therefore, the P&S "was effective as a matter of law after July 14 when the [Sellers'] purported termination rights would have expired." However, the Disputed Provision did not require the Sellers to "declare" the P&S "terminated by July 14." Rather, the P&S became unenforceable as a matter of law upon the non-occurrence of the condition precedent. See In re Estate of Kelly, 130 N.H. at 781. Having rejected the premise of the Buyers' argument, we necessarily reject the argument itself.

The Buyers next argue that the Sellers breached the P&S by "prematurely ending their search for suitable housing before July 14." (Bolding omitted.) However, the trial court found that the Sellers "were justified in concluding that there was no reasonable likelihood they would find a suitable house by the July 14, 2018 deadline" in light of "their particular needs," and, contrary to the Buyers' assertions, the record supports this finding.

Ms. LaPlante, a Manchester college professor, testified that she began looking for a new home in the summer of 2017. She explained that by that time, her "very severe allergies" to the birch and oak trees around the home had become "debilitating." Ms. LaPlante testified that the Sellers sought a four-bedroom home on the Seacoast with at least two acres on which they could build a large garage. Mr. LaPlante testified that he is a mechanical engineer, who works out of his house, designing and building "things that involve microprocessors"; his work requires "a full two-bay garage at the very least."

According to Ms. LaPlante, the Sellers also wanted a home that provided her with "a decent commute" to Manchester. The Sellers chose to look for a home on the Seacoast because there are fewer birch trees there.

By the end of May 2018, Ms. LaPlante estimated that she had viewed "probably, easily 100 homes online." After retaining a realtor in April 2018 and before submitting an offer on the Stratham house in June 2018, Ms. LaPlante estimated that the Sellers visited approximately 20 homes in person. In addition, there was evidence that when the Sellers were looking for "suitable housing" in the spring of 2018, inventory in the Seacoast real estate market was very low.

The Sellers visited the Stratham property on June 1, 2018, and submitted an offer to buy it on June 3. The offer was contingent upon their review of any restrictive covenants of record. Although the home had only a two-car garage, the Sellers planned to build another garage for Mr. LaPlante's equipment. According to Ms. LaPlante, the home had "some very serious foundation issues," dry rot, "crumbling . . . retaining walls," and a 30-year-old roof. Ms. LaPlante testified that, because the Sellers were concerned that the home would not "make it through inspections," they asked their realtor to insert the Disputed Provision into the P&S for the sale of their Concord home.

On June 4, the day after the parties fully executed the P&S at issue, the Sellers received the restrictive covenants of record for the Stratham house. Mr. LaPlante testified that the restrictive covenants possibly precluded the Sellers from building a sufficiently large garage. He testified that "without being able to build the garage," he "had no place to work and . . . no place to put [his] machine shop." According to Mr. LaPlante, the Sellers "realized that not only was [the Stratham] house not going to work, but that none of the other houses [they] were looking at were going to work" because "nearly every house [they] looked at was in a subdivision," and "all subdivisions have covenants of some sort that would prevent [them]" from building a sufficiently large garage. The Sellers viewed the restrictive covenants as "a deal breaker," and, therefore, withdrew their offer.

Ms. LaPlante testified that, at that point, the Sellers felt "like [they] had exhausted [their] search" for a suitable home. They thought it unlikely that they would find "another house because [they] already exhausted what [they] were looking for, and the criteria were very limiting as far as subdivisions go." Ms. LaPlante "was pretty confident" that the Sellers "would not be able to find" a suitable home.

Ms. LaPlante testified that the Sellers instructed their realtor on June 5 that they "exercise[d] the contingency" in the Disputed Provision because they were concerned "about trying to find another home, and being able to close, go through escrow, close, move, and everything" before classes started in the fall.

6

She testified that the Sellers also decided to remain in their home because the allergy symptoms that had prompted them to search for a new home had abated. Ms. LaPlante explained that the Sellers decided to exercise the contingency on June 5 because "at that point, . . . the purchase and sale with the [Buyers] was less than 48 hours" old. The Sellers knew that the Buyers "hadn't put any money down." According to Ms. LaPlante, the Sellers "were just trying to be good humans and wanted to . . . prevent [the Buyers] from expending any more time, putting any money down, and just . . . let them go on their way and look for another home." Ms. LaPlante testified that the Sellers requested that their realtor remove the listing for their home.

From this evidence, the trial court reasonably found that the Sellers "were justified in concluding that there was no reasonable likelihood they would find a suitable house by the July 14, 2018 deadline" in light of "their particular needs." Although the Buyers cite contradictory evidence, any conflicts in the evidence were for the trial court to resolve in the first instance. See Bacon, 167 N.H. at 596. Accordingly, because the condition precedent to the P&S failed, the P&S was unenforceable, and the Sellers were not in breach. See In re Estate of Kelly, 130 N.H. at 781-82.

### 2. Breach of the Implied Covenant

The Buyers similarly argue that the Sellers violated the implied covenant of good faith and fair dealing "by ending their search for suitable housing before July 14." In every agreement, there is an implied covenant that the parties will act in good faith and fairly with one another. Livingston v. 18 Mile Point Drive, 158 N.H. 619, 624 (2009). In New Hampshire, there is not merely one rule of implied good-faith duty, but a series of doctrines, each of which serves different functions. Id. The various implied good-faith obligations fall into three general categories: (1) contract formation; (2) termination of at-will employment agreements; and (3) limitation of discretion in contractual performance. Id. This case deals with the third category. The third category is comparatively narrow; however, its broader function is to prohibit behavior inconsistent with the parties' agreed-upon common purpose and justified expectations, with common standards of decency, fairness, and reasonableness. Id.

In Centronics Corp. v. Genicom Corp., we set forth four questions to address in determining whether a party breached such a covenant. Centronics Corp. v. Genicom Corp., 132 N.H. 133, 143-44 (1989). First, does the agreement "allow . . . or confer upon the defendant a degree of discretion in performance tantamount to a power to deprive the plaintiff of a substantial proportion of the agreement's value?" Id. at 144. Second, did the parties intend "to make a legally enforceable contract?" Id. Third, "has the defendant's exercise of discretion exceeded the limits of reasonableness?" Id.

Finally, did the defendant's abuse of discretion cause the damage complained of or does the damage "result from events beyond the control of either party, against which the defendant has no obligation to protect the plaintiff?" Id.

The Buyers' implied covenant claim turns upon the third question — whether the Sellers reasonably terminated their search for a suitable home on June 5. As discussed, the record supports the trial court's finding that "given their particular needs, the [Sellers] were justified in concluding that there was no reasonable likelihood they would find a suitable house by the July 14, 2018 deadline." This finding compels the conclusion that the Sellers did not breach the implied covenant of good faith and fair dealing when they expressed their intent not to perform under the P&S on June 5. Having concluded that the Sellers did not breach either the P&S or the covenant of good faith and fair dealing implied therein, we necessarily also conclude that the Buyers are not entitled to specific performance.

### D. Attorney's Fees

In their post-trial memorandum, the Buyers requested that the trial court award them attorney's fees for having to defend against the Sellers' counterclaim for attorney's fees. The trial court declined the Buyers' request after finding that the Sellers' attorney's fees request was not brought in bad faith, or for vexatious, wanton, or oppressive motives.

The general rule in New Hampshire is that parties pay their own attorney's fees. DiMinico v. Centennial Estates Coop., 173 N.H. 150, 160 (2020). A judicially-created exception to this rule allows for attorney's fees to be awarded based on bad faith litigation. Id. An award of attorney's fees under this exception is appropriate when one party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, when the litigant's conduct can be characterized as unreasonably obdurate or obstinate, and when it should have been unnecessary for the successful party to have defended the action. See id. at 160-61. We will not overturn the trial court's decision concerning attorney's fees absent an unsustainable exercise of discretion. Id. at 161. To warrant reversal, the discretion must have been exercised for reasons clearly untenable or to an extent clearly unreasonable to the prejudice of the aggrieved party on that issue. Id. In evaluating the trial court's ruling on this issue, we acknowledge the tremendous deference given a trial court's decision regarding attorney's fees. Id. If there is some support in the record for the trial court's determination, we will uphold it. Id.

Based upon our review of the trial court's order, the Buyers' challenges to it, and the record submitted on appeal, the Buyers have failed to persuade

us that the trial court unsustainably exercised its discretion by denying their request for attorney's fees.

For all of the above reasons, we affirm the trial court's decision.

<u>Affirmed</u>.

MACDONALD, C.J., and BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.