BOUDIN, Circuit Judge.
 

 Unitex, Inc., a New Hampshire Corporation, made graphics equipment purchased by newspaper and magazine publishers. In March 1985, Unitex defaulted on a $3 million bank loan owed to Indian Head National Bank (“the bank”).
 
 [1]
 
 The loan was secured by all of Unitex’ assets and on March 8,1985, Indian Head took possession of Unitex’ entire operation. The bank’s object was to sell Unitex as an ongoing business, but for the time being it reduced Unitex’ activities to servicing customers and providing spare parts. A number of Unitex’ customers told the bank that they would cease using Unitex as a supplier unless Unitex acquired new management by June 1985.
 

 In late May 1985, after soliciting unsuccessfully for buyers, the bank received an offer from Graphics Technology, Inc. (“GTI”). GTI was a start-up company formed by three principals in order to purchase Unitex. Two of them had considerable experience in graphics technology and the principals visited the Unitex plant and spoke with employees and distributors. GTI aimed to purchase Unitex with borrowed money and retained two firms to assist it in raising the capital: A R Technology, Inc., a financial consultant, and Parker Benjamin, Inc., a regional investment banker.
 

 On May 22,1985, GTI made a written offer to Indian Head to purchase the assets of Unitex for $3,250,000. Ronald Cote, the bank officer primarily involved in seeking a buyer for the assets, spoke to a Parker Benjamin representative several times and was told that it had a “high level of confidence [the] deal can be done and rather quickly.” A representative of A R Technology, Inc. also told the bank of Parker Benjamin’s optimism. The bank drafted but did not transmit a letter dated May 27 accepting GTI’s May 22 offer.
 

 On May 29, 1985, the GTI principals met with Cote and the bank’s president to discuss the May 22 offer. The bank presented a draft proposal calling for a July 12 closing date and a $200,000 nonrefundable deposit to be made when the bank accepted the offer. GTI furnished a proposed interim plan for GTI to take over operation of Unitex prior to the closing (the bank having expressed a desire to surrender day-to-day management). Indian Head objected to two aspects of the interim operation plan and GTI offered modi
 
 *19
 
 fications. GTI balked at the $200,000 deposit and this issue was left unresolved.
 

 On June 1, 1985, GTI sent Cote a letter providing more detail about the interim operating plan and increasing the GTI offer to $3,400,000. The letter said that Unitex customers, contacted by GTI, were enthusiastic and some had expressed an interest in offering financial assistance to GTI, if required; also, according to the letter, key former Uni-tex employees were willing to rejoin the company. There was no mention of the nonrefundable deposit, but the letter said that GTI was “rapidly reviewing the remaining few [open points] for a final solution.”
 

 On June 3, 1985, Chorus Data Systems, Inc. (“Chorus”), made the bank a competing proposal. In substance, it proposed a joint venture between Chorus and the bank looking toward the operation of Unitex for a period, followed by a public offering of a rebuilt Unitex a year or so hence; the bank’s expected gain was projected to be between $3 million and $8 million, depending on the price obtained in the public offering. The bank was attracted by the prospect of sharing in the value of a revived Unitex. In a June 4 meeting with GTI representatives, the bank rejected GTI’s offer.
 

 On June 5, 1985, representatives of the bank and Chorus met. Cote rejected the joint venture approach on grounds of unspecified regulatory problems; he suggested instead that
 
 Fleet
 
 -take a note
 
 for
 
 $3 million from a proposed new company (which would own the Unitex assets) and convert the note into equity four months later. An agreement in principle along these lines was reached either then or the next day. On June 6, GTI was told that the bank had decided to sell Unitex to another bidder. Unitex’ customers were advised that Unitex would soon be operating under new ownership headed by Chorus.
 

 On June 20, 1985, Chorus and the bank signed a written agreement. The details are complicated but in substance á new corporation — called Cuneiform — was to purchase the Unitex assets. A $3 million interest bearing note would be issued to the bank by Cuneiform, and the note would be exchanged in 120 days for convertible preferred stock to be held by the bank. If, as the parties anticipated, the new company were ultimately offered to the public or sold to another company, the preferred stock would be converted to common stock at an agreed upon ratio and the bank would obtain 49 percent of the business and thereby share in the upside profit. No deposit was required from Chorus or the new entity, nor did Chorus provide any guarantee of the $3 million note.
 

 In July 1985, Unitex filed for bankruptcy. In bankruptcy, the claims of unsecured creditors of Unitex exceeded $3,700,000. On March 7, 1990, Dennis Bezanson, trustee of the estate of Unitex, filed the present action in district court against Fleet as the successor to Indian Head. The complaint, so far as pertinent here, charged that Indian Head had violated its duty under New Hampshire law by failing to dispose of the Unitex assets in a commercially reasonable manner.
 

 The case was tried to a jury in March 1993. The jury found in favor of the trustee and awarded damages of $379,779.21, effectively the $3,400,000 offer made by GTI less the amount Unitek owed the bank.
 
 [2]
 

 Fleet filed post-trial motions for judgment as a matter of law or for a new trial, attacking the jury verdict as to both liability and damages. In a decision filed on August 27, 1993, the district court found that the evidence supported the jury’s finding of liability but that Fleet was entitled to judgment as a matter of law because the trustee had not provided evidence of damages sufficient to permit a reasonable jury to find that damages had been proved with “reasonable certainty.” The new trial motion was dismissed as moot.
 

 The trustee has appealed from the district court’s judgment in favor of Fleet. Fleet not only defends the judgment but argues, in the alternative, that it was also entitled to judgment as a matter of law on the issue of liability. Fleet has not cross-
 
 *20
 
 appealed, but it is entitled to defend the district court’s judgment — that the trustee take nothing — on any ground properly preserved in the district court.
 
 See Martin v. Tango’s Restaurant, Inc.,
 
 969 F.2d 1319, 1325 (1st Cir.1992).
 

 We address the issue of liability first and then turn to the issue of damages. The applicable law in this case is in part state and in part federal. State law determines what had to be proved, by whom and to what degree of persuasion. Federal law determines the relationship between judge and jury, including the standard — that no reasonable jury could find otherwise — for granting judgment notwithstanding the verdict. Our review of such a judgment is
 
 de novo. See Biggins v. Hazen Paper Co.,
 
 953 F.2d 1405, 1409 (1st Cir.1992).
 

 1. The Uniform Commercial Code, adopted by New Hampshire, provides that sale of collateral to satisfy a debt must be “commercially reasonable” in “every aspect” including “method, manner, time, place and terms.” N.H.Rev.Stat.Ann. § 382-A:9-504(3). We agree with the district court’s concise gloss on the “commercially reasonable” language: commercial reasonableness normally depends on evaluation of all the circumstances surrounding the disposition of collateral; and in general “no single factor, even price, will conclusively determine the commercial reasonableness of a secured party’s actions.”
 
 [3]
 

 Fleet argues on appeal that the party disposing of collateral can never be deemed unreasonable if it accepts a lower
 
 firm
 
 offer in preference to a higher but contingent one. This argument need not detain us long. Common sense alone suggests that in some circumstances a higher contingent offer will be far more valuable than a lower certain one. The proverb says that a bird in the hand is worth two in the bush; it does not say that a bird in hand is worth more than any number of birds in the bush.
 

 Even if there were a rule such as that urged by Fleet — which there is not — it is doubtful that it would apply here. The $3 million offer by Chorus appears to have been “certain” only in a formal sense. In substance, nothing secured the $3 million note obtained from Cuneiform beyond the original Unitex assets. This does not mean that the deal was a bad one from the bank’s point of view but only that the “firm” offer Indian Head accepted gave it no more security than it already had.
 

 Whether the action of the bank was commercially unreasonable judged by all the circumstances is a more interesting question. Perhaps the apparent prospects of Unitex as a going company would have made it prudent for an actual owner of the assets to reject a $3,400,000 offer and to prefer an equity stake while the business was resuscitated. Similarly, a security holder, owed $5 million, who in good faith held out for more than $3,400,-000 might well have been able to defend this judgment as a reasonable one, even if the strategy turned out badly.
 
 [4]
 

 We need not pursue these issues because Indian Head was not the owner of the property, and its actions as a secured creditor were tainted by bad faith, or so the jury must have found. One who possesses collateral for a loan , in default cannot walk away with the collateral if it is worth more than the debt. Rather, the lender normally is entitled to the value of the collateral up to the amount of the outstanding debt. The balance belongs to the borrower or, if the borrower is then bankrupt, to the bankruptcy trustee on behalf of the other creditors.
 
 See
 
 N.H.Rev.Stat.Ann. § 382-A:9-504(2) (absent agreement “the secured party must account to the debtor for any surplus”);
 
 Contrail Leasing Partners, Ltd. v. Consolidated Airways, Inc.,
 
 742 F.2d 1095 (7th Cir.1984).
 

 In this case, the $3,400,000 offer by GTI was for more than the balance owed the
 
 *21
 
 bank. If the bank had been seriously’ concerned about the reliability of the offer or had feared that customers would desert Uni-tex before the deal could be completed, it might have rejected GTI’s proposal on those grounds. But what happened strongly suggests not that the bank doubted that it could recover its full outstanding debt but that it became interested in obtaining even more. But anything more belonged to the creditors and not to the bank. The jury probably thought that the bank’s conduct was deplorable and in no sense a “commercially reasonable” disposition.
 

 In fairness to Indian Head, we note that there is also some evidence consistent with its position that it acted in good faith. For example, notes made by Cote say that on June 6 Cote spoke to Parker Benjamin “to clarify” its expectations and was told that there was “a high probability” of raising the money but that the financing depended on verifying Unitex’ assets and this would take three weeks. Still, it was up the jury to weigh the conflicting inferences from all the evidence and to conclude, as it apparently did, that Cote was protecting the record after the decision had been made.
 

 2. The question whether evidence is adequate to show damages is closer. In this case, the district court held that New Hampshire law required the damages be proved to a “reasonable certainty.” The district court concluded that no reasonable jury could find it reasonably certain that GTI would have been able to finance and carry through the transaction if its offer had been accepted. Parker Benjamin’s expressions of confidence “that [the] deal can be done and rather quickly” were, the court found, “nothing more than speculation....”
 

 Under New Hampshire law, the debtor may recover as damages “any loss caused” by the secured party’s unreasonable disposition of the collateral. N.H.Rev.Stat. Ann. 382-A:9-507.
 
 See Ato Z Rental, Inc. v. Wilson,
 
 413 F.2d 899 (10th Cir.1969) (damages based on rejected offer). In commercial litigation in New Hampshire, as elsewhere, the burden of proof of damages is upon the claimant who must show by “a preponderance” of the evidence both the extent and amount of such damages.
 
 [5]
 
 Our concern is not with these propositions, but with the district court’s further conclusion that New Hampshire law required that the damages be established with “reasonable certainty.”
 

 The district court borrowed its “reasonable certainty” standard from two New Hampshire cases that impose this requirement on the computation of lost profits in breach of contract cases.
 
 Great Lakes Aircraft Co. v. City of Claremont,
 
 135 N.H. 270, 608 A.2d 840 (1992);
 
 Hydraform Products Corp. v. American Steel,
 
 127 N.H. 187, 498 A2d 339 (1985). These eases are ones in which the claimant argued that a business would have been profitable in a specified amount but for the breach of contract or other wrongful conduct of the wrongdoer. Lost profits of this kind are often quite speculative; they depend upon how a variety of variables affecting a stream of revenues and expenses would have played out over time, if the wrongdoing had not occurred.
 

 Our ease does not require such a complex conjectural judgment: the only question is whether the specific transaction in question — a $3,400,000 purchase of Unitex assets by GTI in or around June 1985 — would have gone forward if the bank had pursued this transaction rather than diverting its efforts to securing an equity stake. This is a matter of prophesy, to be sure, but we see no reason in policy and nothing in the New Hampshire case law to suggest that the trustee needed to show anything more than the “more-likely-than-not” prospect usually associated with a preponderance of the evidence standard.
 
 [6]
 

 
 *22
 
 The New Hampshire UCC pertinently provides that its remedies shall be liberally administered “to the end that the aggrieved party may be put in as good a position as if the other party had fully performed” and the comment to the provision notes: “Compensatory damages are often at best approximate: they have to be proved with whatever definiteness and accuracy the facts permit, but no more.” N.H.Rev.Stat. § 382-A: 1-106(1) and comment 1. Finally, even if “reasonable certainty” were the standard in this case, there is marked inclination to relax the test where the defendant’s conduct is willful.
 
 See
 
 A. Farnsworth,
 
 Contracts
 
 § 12.15, at 920-21 (2d ed. 1990).
 

 Resolving credibility issues and all reasonable inferences in favor of the jury verdict,
 
 see Putnam Resources v. Pateman,
 
 958 F.2d 448, 459 (1st Cir.1992), we think that the evidence is adequate to support the jury’s view that the GTI transaction would more likely than not have succeeded but for the bank’s misconduct. In considering whether financing would have been secured, the jury was entitled to rely on the rather general but also quite confident predictions attributed to GTI’s investment banker. These statements were hearsay because they appeared in the form of notes made by the bank representative who conferred with Parker Benjamin. But there was no objection to admission of the notes and recorded statements may therefore be considered for the truth of the matter asserted. For all we know, a Parker Benjamin witness might have been summoned if an objection had been made.
 

 Of course, such predictions would carry far more weight if the Parker Benjamin representative had provided more detail to underpin his conclusion — for example, by describing preliminary efforts to raise the money, similar past transactions, or the commercial promise of Unitex. Still, experts are allowed to testify to their bare conclusions,
 
 see
 
 Fed.R.Evid. 703, and the bare conclusion here is quite favorable to the trustee. Further, the bank’s action turning down the $3,400,000 offer in favor of retaining an equity stake might be viewed as a judgment by the bank that the assets were worth at least $3,400,000 and, if the bank thought so, the jury might suppose that potential lenders to GTI would reach the same conclusion.
 

 The district court expressed doubt that the investment banker could make a well grounded judgment about financing when GTI itself had still not received all of the information about Unitex that GTI wanted from the bank. Based on the testimony, there is no reason to believe that GTI was seeking anything more than detailed verification about matters represented in the offering “package” that the bank provided to potential bidders. The mere fact that GTI was seeking additional information or confirmation is not itself enough to show that Parker Benjamin’s prediction of financing was irresponsible.
 

 The bank points to a number of other uncertainties that attended the GTI proposal. In addition to GTI’s need for financing, GTI requested a substantial period in which to evaluate Unitex; the question of management of Unitex during the transition and before closing remained to be settled; and the issue of the nonrefundable downpayment was never resolved. Fleet’s brief tries to develop these uncertainties to furnish sound reasons why Indian Head would in good faith have been justified in rejecting GTI in favor of Chorus.
 

 The jury, however, was entitled to conclude that the bank did not make such a good faith judgment but was enthusiastic about the GTI proposal until its attention was diverted by the lure of improper gain. GTI’s own enthusiasm for the transaction is unquestioned, and its efforts to secure financing were underway and had been optimistically assessed. Thus, a reasonable jury could have found that it was more likely than not that the GTI proposal would ultimately have been accepted, and financing for it achieved,
 
 but for
 
 the bank’s bad faith rejection of the GTI proposal.
 

 The judgment of the district court is
 
 reversed
 
 and the matter is
 
 remanded
 
 for further proceedings consistent with this opinion.
 

 [1]
 

 . Fleet Bank-NH (“Fleet”) succeeded to the interests of Indian Head at some time after the transactions at issue in this case.
 

 [2]
 

 . Although the original loan to Unitex had been for $3 million, Indian Head was owed $3,020,-220.79 in June 1985, apparently because of expenses incurred by the bank for which Unitex was responsible.
 

 [3]
 

 .
 
 See generally, e.g., C.I.T. Corp. v. Lee Pontiac, Inc.,
 
 513 F.2d 207, 209 (9th Cir.1975);
 
 Georgia Pacific Corp. v. First Wisconsin Financial Corp.,
 
 805 F.Supp. 610, 617 (N.D.Ill.1992); 7 A.L.R. 4th 309 (1981) (collecting cases).
 

 [4]
 

 . Apparently in the event Unitex' technology proved to be rapidly outmoded by developments in computerization. In this respect, both GTI and Indian Head apparently were deceived in thinking that Unitex had a bright future.
 

 [5]
 

 .
 
 See Baley v. Sommovigo,
 
 137 N.H. 526, 631 A.2d 913, 917 (1993) ("The party seeking to recover damages has the burden of proving by a preponderance of the evidence the extent and amount of such damages.");
 
 Grant v. Town of Newton,
 
 117 N.H. 159, 370 A.2d 285, 287 (1977) (claimant must show by preponderance causation of “and extent and amount of such damages.”).
 

 [6]
 

 . The phrase "lost profits” is too mutable to provide a hard-edged test for when reasonable certainty is required; but we doubt that the label well suits the claim of the trustee to have an estate asset sold in good faith for as close to fair value as circumstances permit.