FILED

FEB 22 2012

NOT FOR PUBLICATION

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP No. NC-10-1294-DHDo |
| SACRAMENTO APARTMENT HOLDINGS, LLC, | Bk. No. 10-40200 |
| Debtor. | |
| TIMOTHY A. WILSON, | |
| Appellant, | |
| v. | **M E M O R A N D U M**[1] |
| LB-RPR REO HOLDINGS, LLC; UNITED STATES TRUSTEE, | |
| Appellees. | |

Argued and Submitted on January 20, 2012
at San Francisco, California

Filed - February 22, 2012

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Leslie Tchaikovsky, Bankruptcy Judge, Presiding

Appearances:   Neither appellant nor appellee LB-RPR REO
Holdings, LLC appeared.  Matthew Kretzer, Esq.,
appeared for the United States Trustee and
submitted on the briefs.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Before:  DUNN, HOLLOWELL and DONOVAN,[2] Bankruptcy Judges.

Timothy A. Wilson ("Wilson"), counsel for the debtor, Sacramento Apartment Holdings, LLC ("Sacramento Apartments"), appeals the following orders of the bankruptcy court: (1) order granting the United States Trustee's ("UST") motion for sanctions against Wilson under Rule 9011;[3] (2) order regarding payment of sanctions to the UST; (3) order regarding payment of sanctions to LB-RPR REO Holdings, LLC ("LB"); and (4) order holding Wilson in civil contempt and imposing coercive and compensatory sanctions. We DISMISS the appeal of the UST sanctions order for lack of jurisdiction, and otherwise, we AFFIRM.

**FACTS**

A.    Gold River Apartments, LLC's chapter 11 case

Gold River Apartments, LLC ("Gold River") owned an apartment complex located in Sacramento, California.  Brian Baniqued ("Baniqued") and Roderick Farmer ("Farmer") were the members of Gold River.  LB held the sole trust deed on the apartment complex securing repayment of a $2.7 million loan made to Gold River.[4]

---

[2] Hon. Thomas B. Donovan, United States Bankruptcy Judge for the Central District of California, sitting by designation.

[3] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[4] JPMCC 2002-C1 Tuolumne Drive Limited Partnership ("JPMCC") originally held the trust deed on the apartment complex securing repayment of the Gold River loan.  JPMCC assigned its right, title and interest in the loan on the apartment complex to German American Capital Corporation, which in turn assigned its right, title and interest to LB.

2

After Gold River defaulted on its loan payments to LB, LB recorded a notice of default and sought judicial foreclosure and the appointment of a receiver in state court in February 2009.

Shortly thereafter, on March 2, 2009, Gold River filed its chapter 11 petition (09-41589) in the Oakland Division of the United States Bankruptcy Court for the Northern District of California.[5]  Gold River scheduled the apartment complex as its only asset.

Wilson represented Gold River in its chapter 11 case.[6]  Gold River was unable to obtain approval of a disclosure statement while Wilson acted as its counsel.[7]

On October 22, 2009, LB filed a motion for relief from stay

---

[5] Judge Leslie Tchaikovsky presided over Gold River's chapter 11 bankruptcy case.

[6] Patrick Calhoun initially represented Gold River in its bankruptcy case.  Wilson substituted in as counsel for Gold River on October 29, 2009.  The bankruptcy court entered an order approving Wilson's employment as counsel for Gold River on November 13, 2009.

[7] After denying approval of Gold River's amended disclosure statement, the bankruptcy court gave Gold River one last opportunity to amend and obtain approval of its disclosure statement.  The bankruptcy court warned in an order to show cause ("OSC") that if Gold River failed to obtain approval of its disclosure statement, the bankruptcy court might convert the chapter 11 case to chapter 7 or dismiss it.
Gold River filed three iterations of a second amended disclosure statement.  The bankruptcy court held two hearings on the OSC based on its doubts, formed after a cursory review of the second amended disclosure statement, that Gold River would succeed in obtaining approval of a disclosure statement.
Following the second OSC hearing, the bankruptcy court entered an order on February 17, 2010, dismissing Gold River's chapter 11 case.

3

seeking to foreclose its lien on the apartment complex. Following a hearing, the bankruptcy court granted LB's motion, entering an order on December 2, 2009. Before the order was entered, Gold River filed two motions for reconsideration.[8] The bankruptcy court denied both motions to reconsider relief from stay in an order entered on December 15, 2009.

Gold River appealed the Gold River relief from stay order to this Panel (NC-09-1403).[9] The Gold River appeal was dismissed by stipulation on February 23, 2010.

B.    Sacramento Apartments chapter 11 case

After it obtained the Gold River relief from stay order, LB again sought in state court the appointment of a receiver to market and sell the apartment complex. A hearing on the appointment of a receiver was set for December 18, 2009.

Sacramento Apartments was formed the day of the receiver appointment hearing. Wilson appeared at the receiver appointment hearing requesting that it be continued so that he could file an opposition on Gold River's behalf. The state court agreed to continue the receiver appointment hearing to December 22, 2009. Hours before the continued receiver appointment hearing, Gold River transferred the apartment complex to Sacramento Apartments, without authorization from the bankruptcy court.

---

[8] Gold River actually filed two motions for leave to file motions for reconsideration. The bankruptcy court construed Gold River's motions for leave in their substance as motions for reconsideration.

[9] Notably, before filing its motions to reconsider, Gold River filed two notices of appeal of the Gold River relief from stay order on December 11, 2009, and December 14, 2009.

4

On the same day, Sacramento Apartments filed a chapter 11 petition (09-34054) in the San Francisco Division of the United States Bankruptcy Court for the Northern District of California. Sacramento Apartments filed its schedules, statement of financial affairs and list of 20 largest unsecured creditors, as well as an amended petition, on January 4, 2010, listing the apartment complex as its only asset. Wilson represented Sacramento Apartments in its chapter 11 case, but he did not seek the bankruptcy court's approval of his employment as Sacramento Apartments' counsel.

LB filed an ex parte motion to transfer venue of Sacramento Apartments' chapter 11 case from the San Francisco Division to the Oakland Division of the bankruptcy court.[10] Sacramento Apartments opposed the transfer venue motion; however, it admitted in its opposition to the transfer venue motion that it filed the chapter 11 case to stop the appointment of a receiver.

The bankruptcy court granted LB's transfer venue motion.[11] A day later, LB filed a motion for relief from stay seeking in rem relief as to the apartment complex under § 362(d)(4)(A) and

---

[10] Judge Thomas Carlson presided over the Sacramento Apartments chapter 11 case while it was in the San Francisco Division of the bankruptcy court. When LB moved to transfer venue of the Sacramento Apartments chapter 11 case to the Oakland Division of the bankruptcy court, LB also asked that Judge Leslie Tchaikovsky be assigned to preside over the chapter 11 case. LB's transfer venue motion was granted in its entirety.

[11] Once it was transferred to the Oakland Division of the bankruptcy court, the Sacramento Apartments chapter 11 case was assigned the following new case number: 10-40020.

(B).[12]  Following several hearings, the bankruptcy court granted LB's relief from stay motion, entering an order on February 18, 2010.

    1.   <u>UST's Rule 9011 motion for sanctions</u>

    The UST meanwhile filed a motion for sanctions against Wilson under Rule 9011.[13]  LB joined in the UST's sanctions

---

[12] Section 362 provides, in relevant part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

. . .

    (4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, and defraud creditors that involved either –
        (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
        (B) multiple bankruptcy filings affecting such real property.

LB specifically contended that Sacramento Apartments filed its chapter 11 petition to delay or hinder LB after Gold River transferred to Sacramento Apartments the apartment complex without LB's consent or court approval.  Alternatively, LB argued, Sacramento Apartments filed its chapter 11 petition to delay or hinder LB by participating in filing multiple bankruptcy petitions affecting the apartment complex.

[13] The UST did not specify in the sanctions motion the particular subsection of Rule 9011 on which it relied.  Based on our reading, we conclude that the UST sought sanctions against Wilson under Rule 9011(b)(1).

6

motion.

The UST asserted in its sanctions motion that Wilson filed the Sacramento Apartments chapter 11 case to circumvent the Gold River relief from stay order. Specifically, the UST contended that Wilson abused the bankruptcy system by: (1) aiding in the creation of Sacramento Apartments and the apartment complex transfer and (2) filing the Sacramento Apartments chapter 11 case as a way to hinder and delay LB from foreclosing on the apartment complex after LB obtained relief from stay. The UST contended that Wilson's actions as Sacramento Apartments' counsel demonstrated bad faith, warranting sanctions against him to deter him from repeating such conduct in the future.

The UST requested that the bankruptcy court require Wilson to pay as sanctions: (1) a penalty to the bankruptcy court; (2) the UST's reasonable attorney's fees and costs incurred in bringing the sanctions motion; and (3) LB's reasonable attorney's fees and costs incurred in dealing with Sacramento Apartments' chapter 11 case.

Wilson filed a motion to recuse the bankruptcy judge in the Sacramento Apartments chapter 11 case. He also filed an opposition to the UST's sanctions motion. Wilson claimed in his opposition that Sacramento Apartments was formed not to delay or hinder LB from foreclosing on the apartment complex, but to implement part of a settlement agreement between Gold River's members, Baniqued and Farmer. According to Wilson, Baniqued and Farmer disagreed as to whether to try to retain the apartment complex, so Baniqued withdrew from Gold River. Farmer then transferred the apartment complex from Gold River to Sacramento

Apartments and authorized Wilson to file Sacramento Apartments' chapter 11 case as a way for Farmer to "start over."

Wilson further contended that Sacramento Apartments filed its chapter 11 case in good faith, seeking to pay LB and other creditors. Wilson moreover contended that he was not required to obtain LB's consent for the apartment complex transfer, but he knew that LB never would have consented to the apartment complex transfer.

Wilson also stated his belief that Sacramento Apartments did not need to obtain the bankruptcy court's approval of the apartment complex transfer because the bankruptcy court had no jurisdiction over the apartment complex once it granted LB relief from stay.

The bankruptcy court held a hearing on February 16, 2010, on Sacramento Apartments' recusal motion and the UST's sanctions motion. At the sanctions motion hearing, Wilson advised the bankruptcy court that Sacramento Apartments wished to withdraw its recusal motion. He further informed the bankruptcy court that Sacramento Apartments agreed to turn over the apartment complex to LB.

Wilson apologized "for some [actions] that [he had] taken, that [he was] really trying to figure out a way – and didn't do a very good job of it – to try to help [Sacramento Apartments] save an asset . . . ." Tr. of February 16, 2010 hr'g, 6:1-4. He asked the bankruptcy court "to accept [his] apology for the kind of mess that [he had] created, but [he was] doing what he [could] to mitigate it . . . ." Tr. of February 16, 2010 hr'g, 7:6-9.

The bankruptcy court declined to issue an order on the

8

recusal motion as Wilson had withdrawn it on Sacramento Apartments' behalf.

As to the motion for sanctions, the bankruptcy court concluded that, because Sacramento Apartments' counsel had "conceded everything that [was] being requested," the only remaining issue concerned the amount of the sanctions sought by the UST and LB. Tr. of February 16, 2010 hr'g, 8:3-6.

The bankruptcy court then advised the moving parties to submit declarations stating the fees and costs they incurred due to Wilson's conduct. When Wilson informed the bankruptcy court that he operated a small boutique firm with limited means to pay any sanctions, the bankruptcy court advised Wilson that he would be provided the opportunity to oppose the fee declarations based on their reasonableness and his ability to pay the fee amounts. The bankruptcy court declined to impose a penalty beyond the fees requested by the UST and LB, concluding that the amount of the fees alone would be "sufficiently substantial" for the purpose of deterring future bad acts. On March 1, 2010, the bankruptcy court entered an order granting the UST's sanctions motion.

a. UST's fee declaration

Both the UST and LB's counsel timely filed their fee declarations. The UST requested $2,850 in total fees incurred by two of its trial attorneys. The UST based the hourly rates of its trial attorneys on their respective backgrounds and experience.

Wilson did not oppose the UST's fee declaration, and the bankruptcy court entered an order on April 1, 2010, requiring Wilson to pay the UST's attorney's fees.

### b. LB's fee declaration

LB's counsel sought $68,018 in fees and $1,177.88 in costs, for a total of $69,195.88. LB's counsel claimed that it incurred its fees and costs from the following matters: (1) the continued receiver appointment hearing; (2) its investigation into postpetition transactions regarding the apartment complex; (3) Sacramento Apartments' chapter 11 case; and (4) Gold River's chapter 11 case, including the appeal of the Gold River relief from stay order. LB's counsel did not provide a task-by-task itemization of the work performed and the time spent on each individual matter. Rather, LB's fee declaration simply set forth the total time spent and described the work it performed for each matter.

Wilson opposed LB's fee declaration. He again argued the merits of the motion for sanctions and also contended that the fees incurred by LB's counsel were excessive and unreasonable; he charged that LB's counsel overreached and ran up fees by liberally using attorneys and other staff over a short period of time. Wilson further asked the bankruptcy court to consider mitigating factors in determining the appropriate amount of sanctions. Wilson pointed out that he dismissed the Gold River appeal and complied with LB's request to turn over the apartment complex. He again stressed that he operated a small law firm with limited means to pay any sanctions award. Any sanctions amount, Wilson claimed, "would adversely affect [his firm's] ability to continue operating." Opposition to LB's fee declaration, 4:19-20.

After reviewing LB's fee declaration and Wilson's

10

opposition, the bankruptcy court entered an order on March 22, 2010, requiring Wilson to pay LB $50,000, payable in ten equal monthly installments of $5,000.

   c. <u>Wilson's motion to reconsider the fee orders</u>

Wilson filed a motion to reconsider both the UST fee order and the LB fee order on March 31, 2010. Wilson restated the objections raised in his opposition to LB's fee declaration nearly word-for-word. Wilson particularly noted that both the UST and LB had failed to provide itemized bills for his review and argued that the failure to do so constituted a violation of his rights to due process. Wilson also complained that the court had not accounted for his limited ability to pay. Without proffering any supporting evidence, Wilson argued that his firm was a recent startup that had never topped a gross income of $5,000 per month. He stated that, to avoid jeopardizing his firm's survival, he could not afford to pay more than $1,000 per month in sanctions. However, Wilson did not proffer any evidence of his or his firm's finances to support his contentions.

The bankruptcy court denied Wilson's motion for reconsideration without a hearing and issued a memorandum decision to that effect. In its decision, the bankruptcy court found that LB's declaration was sufficiently detailed to allow Wilson to challenge the reasonableness of specific tasks performed, which he had failed to do in his opposition. The bankruptcy court further found that Wilson's tardy demand for an itemization of these tasks constituted an effort to delay enforcement of the court's order. The bankruptcy court concluded with the observation that Wilson's motion reflected a lack of

recognition that his conduct was unacceptable. In a footnote, the court suggested that Wilson confer with LB to work out a reasonable payment plan, in light of Wilson's financial situation.

Wilson filed three more motions for reconsideration in late April and June of 2010. The bankruptcy court did not address these additional motions to reconsider.[14]

2. **LB's motion for civil contempt order**

A month after entry of the order denying reconsideration, LB filed a motion for entry of an order holding Wilson in civil contempt for failing to comply with the bankruptcy court's fee order and imposing coercive and compensatory sanctions on Wilson. LB asserted that Wilson had not made any payments under the LB fee order. It further mentioned that Wilson had not contacted it to work out a payment plan as recommended by the bankruptcy court.

LB requested coercive sanctions of $200 per day until Wilson paid LB all sums due, and compensatory sanctions of $2,614.50, for LB's expenses incurred in preparing the civil contempt motion and in attending the hearing on it.

The court held a hearing on the civil contempt motion at which Wilson and LB's counsel appeared. At the hearing, Wilson was reprimanded for his improper and belligerent attempts to argue his multiple motions for reconsideration, which were not before the bankruptcy court. The bankruptcy court further noted

---

[14] We presume the bankruptcy court declined to address these additional motions to reconsider because they were filed late. See Rule 9023.

12

Wilson's failure to meet with opposing counsel to work out a payment plan, as recommended in the bankruptcy court's prior memorandum decision. The bankruptcy court then granted LB's civil contempt motion in its entirety, including in the order a direction for LB's counsel to file and serve on Wilson an itemized statement of all payments due under the sanctions and contempt orders.

Wilson moved to amend or alter the civil contempt order under Rules 9023 and 7052, though, in fact, he sought further reconsideration of the fee orders along with the civil contempt order. Wilson claimed that the bankruptcy court overlooked his sworn statements that it was impossible for him to pay the sanctions awarded in the fee orders because he lacked sufficient funds. He requested that the bankruptcy court make additional findings regarding his financial inability to pay the sanctions. In support of his motion to amend, he submitted various bank statements and bills as evidence of his financial circumstances.

The bankruptcy court denied Wilson's motion to amend. It pointed out that it had fully set forth its findings in its memorandum decision on Wilson's motion to reconsider the fee orders. The bankruptcy court further noted that Wilson had appealed its rulings, so any errors of law or fact or any abuse of discretion by the bankruptcy court presumably would be corrected on appeal.

3.   LB's ex parte application for entry of an enforceable sanctions order

On January 12, 2011, LB submitted an ex parte application for entry of an enforceable sanctions order against Wilson

pursuant to the civil contempt order. LB claimed that Wilson owed a total of $87,014.50, consisting of: (1) the $50,000 sanctions award under the LB fee order; (2) $2,614.50 in compensatory sanctions under the civil contempt order; and (3) $34,400 in per diem sanctions under the civil contempt order.[15]

The bankruptcy court entered an order approving the application, and an abstract of judgment in the amount of $87,014.50 against Wilson was entered on January 21, 2011.

Wilson appeals the sanctions order, the UST fee order, the LB fee order and the civil contempt order.

**JURISDICTION**

Before we begin our analysis, we first must address two jurisdictional questions, one raised by the UST, and the other by Wilson. We review de novo our own jurisdiction. Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs), 339 F.3d 782, 788 (9th Cir. 2003). We review de novo the timeliness of a notice of a appeal, as it is a question of law. Delaney v. Alexander (In re Delaney), 29 F.3d 516, 517 (9th Cir. 1994).

A.    UST's question regarding this Panel's jurisdiction

On January 26, 2011, we entered an order stating that the

---

[15] The civil contempt order provided for a $200/day coercive sanction until Wilson paid in full all sums due and owing under the LB fee order. According to LB's counsel, 172 days had passed between July 16, 2010, the first day following entry of the civil contempt order, and January 3, 2011, the date when the final installment payment under the LB fee order came due. LB's counsel thus calculated $34,400 in total coercive sanctions due and owing by Wilson.

14

UST fee order appeared to be a final order from which no timely notice of appeal was filed. We mentioned that the parties could raise in their briefs the issue of whether Wilson's appeal was timely as to the sanctions awarded to the UST.

The UST contends on appeal that we lack jurisdiction to decide Wilson's appeal of the UST fee order because he filed his notice of appeal late. Wilson had fourteen days in which to file his notice of appeal of the UST fee order once it became final. See 28 U.S.C. § 158(c)(2), Rule 8002(a).

Although the UST fee order was entered on April 1, 2010, it did not become final until after the order denying Wilson's motion for reconsideration was entered on April 21, 2010. As the UST points out, Wilson's motion for reconsideration tolled the appeal period. See Rule 8002(b)(2). Once the bankruptcy court entered the order denying reconsideration, Wilson had fourteen days from April 21, 2010 in which to file a notice of appeal of the order. Wilson's three additional motions to reconsider did not toll the appeal period for the UST fee order. See Ysais v. Richardson, 603 F.3d 1175, 1178 (10th Cir. 2010)(holding that second motion for reconsideration tolled time to appeal district court's denial of first motion for reconsideration, but did not extend time for filing notice of appeal from underlying amended final judgment). Wilson thus had to file his notice of appeal of the UST fee order by May 5, 2010. Wilson did not file his notice of appeal of the UST fee order until July 29, 2010.

We agree with the UST that Wilson's notice of appeal of the UST fee order was untimely. A notice of appeal must be filed within fourteen days of the date of the entry of the order

15

appealed from. See Rule 8002(a). "The provisions of Bankruptcy Rule 8002 are jurisdictional; the untimely filing of a notice of appeal deprives the appellate court of jurisdiction to review the bankruptcy court's order." Delaney, 29 F.3d at 518 (quoting Anderson v. Mouradick (In re Mouradick), 13 F.3d 326, 327 (9th Cir. 1994))(internal quotation marks omitted). Although there is some flexibility in Rule 8002, "we strictly enforce its time provisions." Id. (quoting Slimick v. Silva (In re Slimick), 928 F.2d 304, 306 (9th Cir. 1990)). Here, Wilson filed his notice of appeal of the UST fee order more than three months after the order was entered. Accordingly, we dismiss Wilson's appeal of the UST fee order, as we lack jurisdiction to consider it.

B. Wilson's question regarding the bankruptcy court's jurisdiction

Wilson contends that the bankruptcy court should not have imposed sanctions against him for his involvement in the apartment complex transfer because it had no jurisdiction over the apartment complex once it granted LB relief from stay. He argues that when the bankruptcy court lost its jurisdiction over the apartment complex, it could not enter any orders or make any rulings, including imposing sanctions, regarding Wilson's actions concerning the apartment complex.

We disagree. Simply because the bankruptcy court entered the Gold River relief from stay order does not mean it lost jurisdiction over Wilson and his conduct concerning the apartment complex. Bankruptcy courts have "the inherent authority to regulate the practice of attorneys who appear before them."

16

In re Nguyen, 447 B.R. 268, 280 (9th Cir. BAP 2011)(en banc). Under its inherent authority, a bankruptcy court may sanction an attorney to deter and provide compensation for a broad range of improper litigation tactics. Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1196 (9th Cir. 2003). See also In re Brooks-Hamilton, 400 B.R. 238, 246-47 (9th Cir. BAP 2009). It also has express authority under the Bankruptcy Code and the Rules to sanction attorneys. Nguyen, 447 B.R. at 281. The bankruptcy court therefore had the authority to sanction Wilson for his abuse of the bankruptcy system by filing Sacramento Apartments' chapter 11 case.

Because the bankruptcy court had jurisdiction to adjudicate the sanctions motion under 28 U.S.C. § 157(b)(1) and (b)(2)(A), we have jurisdiction to review the appeal under 28 U.S.C. § 158.

**ISSUES**

(1) Did the bankruptcy court abuse its discretion in sanctioning Wilson?

(2) Did the bankruptcy court abuse its discretion in determining the amount of sanctions to be paid to LB?

(3) Did the bankruptcy court abuse its discretion in holding Wilson in civil contempt?

**STANDARDS OF REVIEW**

We review the bankruptcy court's factual findings for clear error and its legal conclusions de novo. Goodrich v. Briones (In re Schwarzkopf), 626 F.3d 1032, 1035 (9th Cir. 2010). "If [the bankruptcy court's] account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse even though convinced that we might have weighed the evidence

17

differently. <u>Anderson v. City of Bessemer City, N.C.</u>, 470 U.S. 564, 573-74 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." <u>Id.</u> at 574.

"We review the bankruptcy court's award of sanctions, including an award of attorney's fees, for an abuse of discretion." <u>Hansbrough v. Birdsell (In re Hercules Enters., Inc.)</u>, 387 F.3d 1024, 1027 (9th Cir. 2004). We conduct the same review for an award of sanctions for civil contempt. <u>Stasz v. Gonzalez (In re Stasz)</u>, 387 B.R. 271, 274 (9th Cir. BAP 2008), <u>aff'd</u>, 348 F. Appx. 233 (9th Cir. 2009), <u>cert. denied</u>, 131 S. Ct. 161 (2010).

We follow a two-part test to determine whether the bankruptcy court abused its discretion. <u>United States v. Hinkson</u>, 585 F.3d 1247, 1261-62 (9th Cir. 2009)(en banc). First, we "determine de novo whether the bankruptcy court identified the correct legal rule to apply to the relief requested." <u>Id.</u> Second, we examine the bankruptcy court's factual findings under the clearly erroneous standard. <u>Id.</u> at 1262 & n.20. We must affirm the bankruptcy court's factual findings unless those findings are "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" <u>Id.</u>

We may affirm on any ground supported by the record. <u>Shanks v. Dressel</u>, 540 F.3d 1082, 1086 (9th Cir. 2008).

///
///
///

18

**DISCUSSION**

A.    The bankruptcy court did not abuse its discretion in sanctioning Wilson

Wilson avers that he did not act in bad faith in aiding in the formation of Sacramento Apartments and in filing Sacramento Apartments' chapter 11 case.  He argues that, contrary to the UST's assertion, Sacramento Apartments' chapter 11 case exhibits few indicia of bad faith under the "new debtor syndrome." Relying on In re Trust Deed Center, Inc., 36 B.R. 846 (Bankr. C.D. Cal. 1984), Wilson contends that a newly created entity has the "right" to file one bankruptcy petition to protect its assets, as long as there is a business purpose in creating the new entity and proceeding in bankruptcy.  He claims that the business purpose in creating Sacramento Apartments was to settle a disagreement between Gold River's two members regarding the handling of the apartment complex.  We disagree that the bankruptcy court clearly erred in its fact findings.

"Rule 9011(b) imposes on attorneys . . . the obligation to insure that all submissions to a bankruptcy court are truthful and for proper litigation purposes."  Miller v. Cardinale (In re DeVille), 361 F.3d 539, 543 (9th Cir. 2004).  Rule 9011 calls for the imposition of sanctions on attorneys who file pleadings and papers in violation of this rule.  Marsch v. Marsch (In re Marsch), 36 F.3d 825, 829 (9th Cir. 2004).

Relevant here is Rule 9011(b)(1), which provides that, by submitting a petition, an attorney is certifying to the best of his or her knowledge, information and belief, formed after reasonable inquiry, that such petition is not being presented for

19

any improper purpose, "such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Rule 9011(b)(1) essentially has a two-fold requirement: (1) the signer of the pleading must certify that it is not frivolous – "that is, it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," and (2) "the signer must ensure that the paper or pleading is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Id. Either frivolousness or improper purpose may serve as a basis for sanctions. Id. A bankruptcy court "must consider both frivolousness and improper purpose on a sliding scale, where the more compelling the showing as to one element, the less decisive need be the showing as to the other." Id. at 830.

Under Rule 9011(c), the bankruptcy court has the authority to impose sanctions on attorneys who violate Rule 9011(b). Sanctions are limited to "what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Rule 9011(c)(2). Sanctions may consist of, or include "an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Id. "[R]easonableness continues to require that the sanction imposed be within the scope of the bankruptcy court's authority and that the sanction be tailored to address the misconduct." Nguyen, 447 B.R. at 280.

20

Wilson cites Trust Deed Center, Inc. in support of his argument that the formation of Sacramento Apartments and the filing of its chapter 11 case were not abuses of the bankruptcy system. He misconstrues Trust Deed Center, Inc.

In Trust Deed Center, Inc., 36 B.R. at 847-48, the general counsel of a corporation with an interest in a shopping center transferred an interest in the shopping center three times, to three different corporations, which filed three sequential chapter 11 petitions. These actions were taken for the admitted purpose of preventing the secured creditor from foreclosing on the shopping center. The bankruptcy court found that the first newly-created corporation receiving an interest had a legitimate business purpose in filing for bankruptcy.

However, the bankruptcy court also concluded that, in filing the chapter 11 cases for the other two entities, the attorney unreasonably and vexatiously multiplied the bankruptcy proceedings in trying to stop foreclosure on the shopping center. Id. at 849. The bankruptcy court imposed monetary sanctions against the attorney as a way to "protect the integrity of the Bankruptcy Code and the judicial process," to punish those who abuse the judicial process and to provide relief for the party contending with the sanctioned party's multiple legal proceedings. Id.

Contrary to Wilson's interpretation, Trust Deed Center, Inc. does not stand for the proposition that newly formed entities always have a right to file one bankruptcy case, as long as it is for a business purpose. The bankruptcy court in Trust Deed Center, Inc. only condoned the first bankruptcy filing. It

21

viewed the two subsequent bankruptcy filings by different entities as abuses of the bankruptcy system.

The bankruptcy court here concluded that Wilson's filing of a chapter 11 petition on behalf of Sacramento Apartments was an abuse of the bankruptcy system, done to preclude or further postpone LB foreclosing on the apartment complex. This finding was supported by ample evidence in the record, and was effectively conceded by Wilson in the February 16, 2010 hearing. Sacramento Apartments was formed on the day of the receiver appointment hearing. Gold River transferred the apartment complex to Sacramento Apartments on the day of the continued receiver appointment hearing. Sacramento Apartments filed its chapter 11 case on the same day, in a different division of the bankruptcy court.

Moreover, Wilson conceded at the sanctions motion hearing that he had created "a mess" and apologized for some of the actions he had taken in Sacramento Apartments' chapter 11 case. He told the bankruptcy court that he was "really trying to figure out a way – and didn't do a very good job of it – to try to help [Sacramento Apartments] save an asset . . . ."

These circumstances substantiate the bankruptcy court's view of the evidence. When there are two permissible views of the evidence, the bankruptcy court's choice between them cannot be clearly erroneous. See Anderson, 470 U.S. at 574.

Even if Wilson had not admitted to his misconduct at the sanctions motion hearing, there is ample evidence demonstrating that he filed Sacramento Apartments' chapter 11 petition in bad faith. He helped Farmer form Sacramento Apartments and filed a

22

chapter 11 petition on its behalf on the day of the continued receiver appointment hearing in San Francisco, rather than in Oakland, where Gold River's case was pending. Wilson admitted in the opposition to the transfer venue motion that he filed Sacramento Apartments' chapter 11 petition to stop the appointment of a receiver. He also indicated in his opposition to the UST's sanctions motion that he knew LB would not consent to the apartment complex transfer. Wilson's actions and statements demonstrate that he filed Sacramento Apartments' chapter 11 case to hinder and delay LB in its foreclosure efforts. Certainly, on this record, we cannot conclude that the bankruptcy court clearly erred in so finding. Because he violated Rule 9011(b)(1) by filing Sacramento Apartments' chapter 11 petition, the bankruptcy court had authority to sanction Wilson. The bankruptcy court did not abuse its discretion in sanctioning Wilson.

B.   <u>The bankruptcy court did not abuse its discretion in determining the amount of sanctions under the LB fee order</u>

A bankruptcy court has significant discretion in determining what sanctions should be imposed for a violation of Rule 9011, "subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." <u>DeVille</u>, 361 F.3d at 553 (quoting Fed. R. Civ. P. 11 advisory committee note (1993)). "A restitutionary award compensating the opposing party for unnecessary litigation expenses . . . is a particularly appropriate sanction in cases involving manipulative petitions

23

filed principally for purposes of delay and harassment." Marsch, 36 F.3d at 831.

Wilson argues that, in determining the amount of sanctions awarded to LB, the bankruptcy court should have considered the following factors: (1) his efforts to mitigate the fees and costs of LB's counsel and (2) his financial circumstances.

Reviewing the record, we believe that Wilson did nothing to mitigate the fees and costs incurred to date by LB in making the concessions at the sanctions motion hearing. LB's counsel would not have incurred those fees and costs in the first place had Wilson not arranged the apartment complex transfer and filed Sacramento Apartments' chapter 11 petition. Had Wilson refrained from such conduct, LB simply would have proceeded with foreclosure on the apartment complex.

With respect to the bankruptcy court's supposed failure to consider his financial circumstances, Wilson did not submit any evidence in the form of bank statements, declarations or other documents to show that he could not afford to pay sanctions in opposition to the LB fee declaration. He simply stated that he operated a small boutique law firm with limited means to pay any sanctions. The bankruptcy court could not have assessed Wilson's financial condition from that simple conclusory statement. In any event, the bankruptcy court did temper the impact of the sanctions award to LB by awarding only $50,000.

Wilson also takes issue with the LB fee declaration. He first contends that the bankruptcy court did not allow him to review and object to the LB fee declaration. He then argues that LB's counsel did not specify the time spent on the work performed

24

for each task in the fee declaration, instead lumping its fees.

Contrary to his assertion, the bankruptcy court provided Wilson with the chance to review and object to the LB fee declaration. The bankruptcy court informed Wilson at the sanctions motion hearing that it would give him the opportunity to oppose the fee declarations, based on unreasonableness of the amount of fees or on his inability to pay the sanctions. The bankruptcy court also provided in the sanctions order a deadline by which Wilson could oppose the fee declarations.

As for his contention that the LB fee declaration should have provided a task-by-task itemization, the bankruptcy court found that the LB fee declaration was "sufficiently detailed" to provide Wilson a chance to challenge the reasonableness of the fees for the specific tasks performed by LB's counsel. The bankruptcy court also pointed out that Wilson raised no such objection in his opposition. Instead, he merely argued that LB's fees and costs were unreasonable and excessive because its counsel "ran up" its fees and costs unnecessarily.

Wilson apparently overlooks the fact that the bankruptcy court discounted approximately 30% of the fees and costs LB's counsel requested. LB's counsel initially requested approximately $70,000 in fees and costs in its fee declaration, but the bankruptcy court reduced the total sanctions award to $50,000.

We acknowledge that the sanctions award is large. But, based on the limited evidence before it, the bankruptcy court awarded an amount sufficient to provide a deterrent effect. Except for his general assertions, Wilson provided no evidence in

25

his opposition to LB's fee declaration demonstrating (1) that LB's counsel's services were unnecessary, (2) that LB's counsel overcharged for its services or that its fees and costs were unreasonable, or (3) that he could not pay the fees and costs requested.

We therefore conclude that the bankruptcy court did not abuse its discretion and properly determined an appropriate amount of sanctions to be awarded to LB.

C.  The bankruptcy court did not abuse its discretion in holding Wilson in civil contempt

Wilson argues that the bankruptcy court should not have held him in civil contempt when it was impossible for him to comply with the sanctions order.  He provided the bankruptcy court with evidence demonstrating his inability to pay the sanctions awarded in the LB fee order in his motion to amend the contempt order. According to Wilson, the bankruptcy court did not accord this evidence due weight when it imposed sanctions.

A bankruptcy court has the power to award civil sanctions for contempt.  Stasz, 387 B.R. at 275.  In order to hold a party in contempt, the bankruptcy court must find that the party "violated a specific and definite order of the court."  Id. (quoting Dyer, 322 F.3d at 1191)(internal quotation marks omitted).  "An alleged contemnor may defend against a finding of contempt by demonstrating a present inability to comply."  United States v. Ayres, 166 F.3d 991, 994 (9th Cir. 1999).  The ability to comply is "a crucial inquiry" for the bankruptcy court to conduct.  Id.  The bankruptcy court therefore "should weigh all the evidence properly before it determines whether or not there

26

is actually a present ability to obey." Id. A contempt proceeding does not open to reconsideration, however, the legal or factual basis of the order allegedly disobeyed by the contemnor. Id. at 995.

At the time the bankruptcy court considered LB's civil contempt motion, Wilson failed to demonstrate that he was financially unable to comply with the LB fee order. He did not provide any declarations, bank account statements or bills showing that he lacked the wherewithal to pay the sanctions. Wilson did not provide bank account statements until after the bankruptcy court ruled on the civil contempt motion; he only provided them with his motion to amend. The bankruptcy court therefore could not have weighed such evidence in determining whether he lacked the ability to comply with the LB fee order. It was Wilson's burden of proof to show that he could not comply with it. He failed to meet that burden. We therefore conclude that the bankruptcy court did not abuse its discretion in holding Wilson in civil contempt and in imposing coercive and compensatory sanctions against him.

**CONCLUSION**

The bankruptcy court did not abuse its discretion in sanctioning Wilson for filing Sacramento Apartments' chapter 11 case for the improper purpose of hindering and delaying LB in its efforts to foreclose on the apartment complex. The bankruptcy court also did not abuse its discretion either in determining the amount of sanctions awarded to LB or in holding Wilson in civil contempt for failing to pay LB the sanctions awarded. Accordingly, we DISMISS the appeal of the UST fee order for lack

27

of jurisdiction and otherwise AFFIRM.